BARRY, SERGEANT-AT-ARMS OF THE UNITED STATES SENATE, ET AL. *v.* UNITED STATES EX REL. CUNNINGHAM.

No. 647.   Argued April 23, 1929.—Decided May 27, 1929.

598

*Mr. George W. Wickersham,* Special Assistant to the Attorney General, with whom *Attorney General Mitchell* was on the brief, for petitioners.

602

604

*Mr. Ruby R. Vale,* with whom *Messrs. Otto Kraus, Jr.,* and *Benjamin M. Golder* were on the brief, for respondent.

607

608

Mr. Justice Sutherland delivered the opinion of the Court.

The questions here presented for determination grow out of an inquiry instituted by the United States Senate in respect of the validity of the election of a United States Senator from Pennsylvania in November, 1926. The inquiry began before the election, immediately after the conclusion of the primaries, by the adoption of a resolution appointing a special committee to investigate expenditures, promises, etc., made to influence the nomination of any person as a candidate or promote the election of any person as a member of the Senate at the general election to be held in November, 1926.

After the Pennsylvania primaries, Cunningham was subpoenaed and appeared before this committee. Among other things, he testified that he was a member of an organization which supported William S. Vare for Senator at the primary election; that he had given to the chairman of the organization $50,000 in two instalments of $25,000 each prior to the holding of the primaries. He had been clerk of a court for 21 years and was then receiving a salary of $8,000 a year. He paid the money to the chairman in cash, but refused to say where he obtained it except that he had not drawn it from a bank. He would not say how long the money had been in his possession; said he had never inherited any, but declined to answer whether he had made money in speculation. In short, he declined to give any information in respect of the sources of the money, insisting that it was his own and the question where he had obtained it was a personal matter. He further said that he had learned the trick from a former senator of " saving money and putting it away and keeping it under cover "; that this senator " was a past master in not letting his right hand know what his left hand done,

and he dealt absolutely in cash. The 'long green' was the issue."

Mr. Vare was nominated and elected at the succeeding November election. The special committee thereafter submitted a partial report in respect of Cunningham's refusal to testify. In January, 1927, Vare's election having been contested by William B. Wilson upon the ground of fraud and unlawful practices in connection with the nomination and election, the Senate adopted a resolution further authorizing the special committee to take possession of ballot boxes, tally sheets, etc., and to preserve evidence in respect of the charges made by Wilson. In February, 1927, Cunningham was recalled and, questions previously put to him having been repeated, he again refused to give the information called for, as he had done at the first hearing.

At the opening of Congress in December, 1927, the Senate adopted an additional resolution, reciting, among other things, that there were numerous instances of fraud and corruption in behalf of Vare's candidacy and that there had been expended in his behalf at the primary election a sum exceeding $785,000. Expenditure of such a large sum of money was declared to be contrary to sound public policy; and the special committee was directed to inquire into the claim of Vare to a seat in the Senate, to take evidence in respect thereto, and report to the Senate—in the meantime, it was resolved, Vare should be denied a seat in the Senate. By a subsequent resolution, the Committee on Privileges and Elections was directed to hear and determine the contest between Vare and Wilson.

The special committee, in March, 1928, reported its proceedings, including testimony given by Cunningham, recited his refusal to give information in response to questions, as hereinbefore set forth, and recommended that he be adjudged in contempt of the committee and of the Senate. The Senate, however, did not adopt the recom-

mendation of the committee, but, instead, passed a resolution reciting Cunningham's contumacy and instructing the President to issue his warrant commanding the Sergeant-at-Arms or his deputy to take the body of Cunningham into custody, and to bring him before the bar of the Senate, "then and there or elsewhere as it may direct, to answer such questions pertinent to the matter under inquiry as the Senate, through its said committee, or the President of the Senate, may propound, and to keep the said Thomas W. Cunningham in custody to await further order of the Senate." The warrant was issued and executed; and thereupon Cunningham brought a habeas corpus proceeding in the federal district court for the eastern district of Pennsylvania.

In his petition for the writ of habeas corpus, Cunningham averred that he was arrested under the warrant by reason of an alleged contempt; and that, by reason of his refusal to disclose his private and individual affairs to the special committee, the Senate had illegally and without authority adjudged him to be in contempt and had issued its warrant accordingly. A return was made to the writ, denying that the Senate had adjudged Cunningham in contempt and, in substance, averring that the warrant by which he was held simply required that he be brought to the bar of the Senate to answer questions pertaining to the matter under inquiry, etc.

The district court, to which the return was made, after a hearing and consideration of written briefs and oral arguments, entered an order discharging the writ and remanding Cunningham to the custody of the Sergeant-at-Arms. A written opinion was handed down by Judge Dickinson, sustaining the power of the Senate to compel the attendance of witnesses under the circumstances above set forth, and holding that the Senate had not proceeded against Cunningham for a contempt; but by its resolution had required his arrest and production at the bar of the

Senate, simply to answer questions pertinent to the matter under inquiry. 25 F. (2d) 733.

Upon appeal, the court of appeals reversed the district court, holding that the arrest was in reality one for contempt, but, if it should be regarded as an arrest to procure Cunningham's attendance as a witness, it was void because a subpoena to attend at the bar of the Senate had not previously been served upon him, and that this was a necessary prerequisite to the issue of an attachment. Treating the proceeding as one for contempt, that court held that the information sought to be elicited and which Cunningham refused to give was not pertinent to the inquiry authorized to be made by the committee, and that Cunningham was justified in declining to answer the questions in respect thereof. Circuit Judge Woolley dissented, substantially adopting the view of the district court. 29 F. (2d) 817.

The correct interpretation of the Senate's action is that given by the district judge and by Judge Woolley. It is true the special committee in its report to the Senate recited Cunningham's contumacy and recommended that he be adjudged in contempt, but the resolution passed by the Senate makes it entirely plain that this recommendation of the committee was not followed. The Senate resolution, after a recital of Cunningham's refusal to answer certain questions, directs that he be attached and brought before the bar of the Senate, not to show cause why he should not be punished for contempt, but " to answer such questions pertinent to the matter under inquiry as the Senate through its said committee or the President of the Senate may propound . . ." We must accept this unequivocal language as expressing the purpose of the Senate to elicit testimony in response to questions to be propounded at the bar of the Senate, and the question whether the information sought to be elicited

from Cunningham by the committee was pertinent to the inquiry which the committee had been directed to make may be put aside as immaterial.

It results that the following are the sole questions here for determination: (1) whether the Senate was engaged in an inquiry which it had constitutional power to make; (2) if so, whether that body had power to bring Cunningham to its bar as a witness by means of a warrant of arrest; and (3) whether as a necessary prerequisite to the issue of such warrant of arrest a subpoena should first have been served and disobeyed.

*First.* Generally, the Senate is a legislative body, exercising in connection with the House only the power to make laws. But it has had conferred upon it by the Constitution certain powers which are not legislative but judicial in character. Among these is the power to judge of the elections, returns and qualifications of its own members. Art. I, § 5, cl. 1. " That power carries with it authority to take such steps as may be appropriate and necessary to secure information upon which to decide concerning elections." *Reed v. County Commissioners,* 277 U. S. 376, 388. Exercise of the power necessarily involves the ascertainment of facts, the attendance of witnesses, the examination of such witnesses, with the power to compel them to answer pertinent questions, to determine the facts and apply the appropriate rules of law, and, finally, to render a judgment which is beyond the authority of any other tribunal to review. In exercising this power, the Senate may, of course, devolve upon a committee of its members the authority to investigate and report; and this is the general, if not the uniform, practice. When evidence is taken by a committee, the pertinency of questions propounded must be determined by reference to the scope of the authority vested in the committee by the Senate. But undoubtedly, the Senate, if it so de-

termine, may in whole or in part dispense with the services of a committee and itself take testimony; and, after conferring authority upon its committee, the Senate, for any reason satisfactory to it and at any stage of the proceeding, may resume charge of the inquiry and conduct it to a conclusion or to such extent as it may see fit. In that event, the limitations put upon the committee obviously do not control the Senate; but that body may deal with the matter, without regard to these limitations, subject only to the restraints imposed by or found in the implications of the Constitution. We cannot assume, in advance of Cunningham's interrogation at the bar of the Senate, that these restraints will not faithfully be observed. It sufficiently appears from the foregoing that the inquiry in which the Senate was engaged, and in respect of which it required the arrest and production of Cunningham, was within its constitutional authority.

It is said, however, that the power conferred upon the Senate is to judge of the elections, returns and qualifications of its "members," and, since the Senate had refused to admit Vare to a seat in the Senate or permit him to take the oath of office, that he was not a member. It is enough to say of this, that upon the face of the returns he had been elected and had received a certificate from the Governor of the state to that effect. Upon these returns and with this certificate, he presented himself to the Senate, claiming all the rights of membership. Thereby, the jurisdiction of the Senate to determine the rightfulness of the claim was invoked and its power to adjudicate such right immediately attached by virtue of § 5 of Article I of the Constitution. Whether, pending this adjudication, the credentials should be accepted, the oath administered, and the full right accorded to participate in the business of the Senate, was a matter within the discretion of the Senate. This has been the practical construction of the

power by both Houses of Congress;* and we perceive no reason why we should reach a different conclusion. When a candidate is elected to either House, he of course is elected a member of the body; and when that body determines, upon presentation of his credentials, without first giving him his seat, that the election is void, there would seem to be no real substance in a claim that the election of a " member " has not been adjudged. To hold otherwise would be to interpret the word " member " with a strictness in no way required by the obvious purpose of the constitutional provision, or necessary to its effective enforcement in accordance with such purpose, which, so far as the present case is concerned, was to vest the Senate with authority to exclude persons asserting membership, who either had not been elected or, what amounts to the same thing, had been elected by resort to fraud, bribery, corruption, or other sinister methods having the effect of vitiating the election.

Nor is there merit in the suggestion that the effect of the refusal of the Senate to seat Vare pending investigation was to deprive the state of its equal representation in the Senate. The equal representation clause is found in Article V, which authorizes and regulates amendments to the Constitution, " provided, . . . that no state, without its consent, shall be deprived of its equal suffrage in the Senate." This constitutes a limitation upon the power

---

* Among the typical cases in the House, where that body refused to seat members in advance of investigation although presenting credentials unimpeachable in form, was that of Roberts, in the 56th Congress, where it was so decided after full debate by a vote of 268 to 50. Cong. Record, Vol. 33, pt. 2, p. 1217.

It was stated at the bar in this case that the Senate in 29 cases had, in advance of investigation, seated persons exhibiting *prima facie* credentials, and in 16 cases had taken the opposite course of refusing to seat such persons, before investigation and determination of charges challenging the right to the seat.

of amendment and has nothing to do with a situation such as the one here presented. The temporary deprivation of equal representation which results from the refusal of the Senate to seat a member pending inquiry as to his election or qualifications is the necessary consequence of the exercise of a constitutional power, and no more deprives the state of its "equal suffrage" in the constitutional sense than would a vote of the Senate vacating the seat of a sitting member or a vote of expulsion.

*Second.* In exercising the power to judge of the elections, returns and qualifications of its members, the Senate acts as a judicial tribunal, and the authority to require the attendance of witnesses is a necessary incident of the power to adjudge, in no wise inferior under like circumstances to that exercised by a court of justice. That this includes the power in some cases to issue a warrant of arrest to compel such attendance, as was done here, does not admit of doubt. *McGrain* v. *Daugherty,* 273 U. S. 135, 160, 180. That case dealt with the power of the Senate thus to compel a witness to appear, to give testimony necessary to enable that body efficiently to exercise a legislative function; but the principle is equally, if not *a fortiori,* applicable where the Senate is exercising a judicial function.

*Third.* The real question is not whether the Senate had power to issue the warrant of arrest, but whether it could do so under the circumstances disclosed by the record. The decision of the court of appeals is that, as a necessary prerequisite to the issue of a warrant of arrest, a subpoena first should have been issued, served, and disobeyed. And undoubtedly the courts recognize this as the practice generally to be followed. But undoubtedly also, a court has power in the exercise of a sound discretion to issue a warrant of arrest without a previous subpoena when there is good reason to believe that otherwise the witness will not be forthcoming. A statute of the United

States (U. S. Code, Title 28, § 659) provides that any federal judge, on application of the district attorney, and being satisfied by proof that any person is a competent and necessary witness in a criminal proceeding in which the United States is a party or interested, may have such person brought before him by a warrant of arrest, to give recognizance, and that such person may be confined until removed for the purpose of giving his testimony, or until he gives the recognizance required by said judge. The constitutionality of this statute apparently has never been doubted. Similar statutes exist in many of the states and have been enforced without question.

*United States* v. *Lloyd,* 4 Blatchf. 427, was a case arising under the federal statute. The validity of the statute was not doubted, although the witness was held under peculiar conditions of severity, because of which the court allowed him to be discharged upon his own recognizance in the sum of $1,000.

In *State of Minnesota ex rel.* v. *Grace,* 18 Minn. 398, a similar statute was upheld and applied in the case of a material witness where it was claimed that there was good reason to believe that he would leave the state before the trial and not return to be present at the time of such trial. The court, using the words of Lord Ellenborough in *Bennett* v. *Watson,* 3 Maule & Selwyn 1, said (p. 402):
" The law intends that the witness shall be forthcoming at all events, and it is a lenient mode which it provides to permit him to go at large upon his own recognizance. However this is only one mode of accomplishing the end, which is his due appearance." The witness, however, was discharged because of an entire absence of proof of any intention on his part not to appear and testify.

The comment of the court in *Crosby* v. *Potts,* 8 Ga. App. 463, 468, is peculiarly apposite: -
" It is a hardship upon one whose only connection with a case is that he happens to know some material fact in

relation thereto that he should be taken into control by the court and held in the custody of the jailer unless he gives bond (which, from poverty, he may be unable to give), conditioned that he will appear and testify; but the exigencies of particular instances do often require just such stringent methods in order to compel the performance of the duty of the witness's appearing and testifying. There are many cases in which an ordinary subpoena would prove inadequate to secure the presence of the witness at the trial. The danger of punishment for contempt on account of a refusal to appear is sometimes too slight to deter the witness from absenting himself; especially is this true where there are but few ties to hold the witness in the jurisdiction where the trial is to be held, and there are reasons why he desires not to testify; for when once he has crossed the state line, he is beyond the grasp of any of the court's processes to bring him to the trial or to punish him for his refusal to answer to a subpoena. We conclude, therefore, that since the law manifestly intends that the courts shall have adequate power to compel the performance of the respective duties falling on those connected in any wise with the case, it may, where the exigencies so require, cause a witness to be held in custody, and in jail if need be, unless he gives reasonable bail for his appearance at the trial."

See also *Ex parte Sheppard,* 43 Tex. Cr. Rep. 372; Chamberlayne, Modern Law of Evidence, § 3622.

The rule is stated by Wharton, 1 Law of Evidence, § 385, that where suspicions exist that a witness may disappear, or be spirited away, before trial, in criminal cases, and when allowed by statute in civil cases, he may be held to bail to appear at the trial and may be committed on failure to furnish it, and that such imprisonment does not violate the sanctions of the federal or state constitutions.

The validity of acts of Congress authorizing courts to exercise the power in question thus seems to be established.

The Senate, having sole authority under the Constitution to judge of the elections, returns and qualifications of its members, may exercise in its own right the incidental power of compelling the attendance of witnesses without the aid of a statute. Compare *Reed* v. *County Commissioners, supra,* p. 388. The following appears from the report of the committee to the Senate upon which the action here complained of was taken. "A subpoena was issued for his appearance early in June. A diligent search failed to locate him. Finally Representative Golder of the Fourth District of Pennsylvania communicated with the committee, stating that Cunningham would accept service. His whereabouts was disclosed and he was served." Upon examination by the committee, he repeatedly refused to answer questions which the committee deemed relevant and of great importance, not upon the ground that the answers would tend to incriminate him, but that they involved personal matters. These questions have already been recited, and it is impossible for us to say that the information sought and refused would not reflect light upon the validity of Vare's election.

It is not necessary to determine whether the information sought was pertinent to the inquiry before the Committee, the scope of which was fixed by the provisions of the Senate resolution. But it might well have been pertinent in an inquiry conducted by the Senate itself, exercising the full, original and unqualified power conferred by the Constitution. If the Senate thought so, and, from the facts before it reasonably believing that this or other important evidence otherwise might be lost, issued its warrant of arrest, it is not for the court to say that in doing so the Senate abused its discretion. The presumption in favor of regularity, which applies to the proceedings of courts, cannot be denied to the proceedings of the Houses of Congress, when acting upon matters within their constitutional authority. It fairly may be assumed that the Senate will deal with the witness in accordance

with well-settled rules and discharge him from custody upon proper assurance, by recognizance or otherwise, that he will appear for interrogation when required. This is all he could properly demand of a court under similar circumstances.

Here the question under consideration concerns the exercise by the Senate of an indubitable power; and if judicial interference can be successfully invoked it can only be upon a clear showing of such arbitrary and improvident use of the power as will constitute a denial of due process of law. That condition we are unable to find in the present case. *Judgment reversed.*