Robert Alton GAMMAGE, Relator,

v.

The Honorable John L. COMPTON et al., Respondents.

No. B–6542.

Supreme Court of Texas.

March 2, 1977.

Kronzer, Abraham & Watkins, Michol O'Connor and W. James Kronzer, Burnett & Jones, O'Rourke & Lawler, Terence L. O'Rourke, Houston, for relator.

Austin & Arnett, Fitzhugh H. Pannill, Jr., and Bertrand C. Moser; Hastings Pannill, Houston, for respondents.

DANIEL, Justice.

This is a mandamus proceeding which arises out of a suit filed by Ron Paul against Robert Alton Gammage in the 151st Judicial District Court seeking to contest the election in which Gammage has been declared to be the winner over Paul for Congressman for the 22nd Congressional District of Texas.

Relator Gammage seeks to have this Court mandamus the Respondent, Honorable John L. Compton, Judge of said Court, to vacate certain orders relating to further deposing of Gammage by counsel for Respondent Paul, to grant such further relief as the Court deems requisite and proper,

and to direct the Respondent Paul to cease and desist from pursuit of this election contest under State court procedures. The principal question is whether the district court has jurisdiction over the contest under Article 9.01 of the Texas Election Code.[1]

At the general election on November 2, 1976, Gammage was declared winner over the incumbent, Paul. A recount was requested by Respondent Paul and it was conducted under the general observation of inspectors from the office of the Texas Secretary of State and counsel from the Privileges and Elections Subcommittee of the United States House of Representatives. The recount showed Gammage to be the winner by 268 votes, and on November 22, 1976, Gammage was certified by the Governor as having won the election. Thereafter, Paul filed this contest in the District Court of Harris County as well as a notice of contest with the United States House of Representatives under the Contested Elections Act, 2 U.S.C. § 381, et seq.

On January 4, 1977, Gammage was unconditionally sworn in as a member of the House. He then filed a motion to dismiss this court proceeding, and it was denied on January 12, 1977. On January 25th, this Court refused Gammage's motion for leave to file a petition for writ of mandamus to order a dismissal of the suit. Thereafter the trial court ordered Gammage to appear on February 12, 1977, to be further deposed by counsel for Paul. Whereupon, Gammage sought and was granted permission to file this petition for writ of mandamus and writ of prohibition.

Relator's principal contention is that Article 9.01, if interpreted as applying to members of Congress, is violative of Article I, § 5, of the Constitution of the United States. The pertinent portion of Article 9.01 reads:

"The district court shall have *original and exclusive jurisdiction of all contests of elections,* general or special, *for all* school, municipal, precinct, county, dis-

trict, state offices, or *federal offices,* except elections for the offices of Governor, Lieutenant Governor, Comptroller of Public Accounts, Treasurer, Commissioner of the General Land Office, Attorney General, and Members of the Legislature." (Emphasis supplied.)

Respondent Paul insists that "federal offices," as used in the foregoing quotation from Article 9.01, includes members of Congress. His interpretation is as though the Article read:

"The district court shall have *original and exclusive jurisdiction of all contests of elections,* general or special, *for all* school, municipal, precinct, county, district, state offices, or *federal offices, including members of each House of the United States Congress . . . ."* (Emphasis supplied.)

Article I, § 5, of the Constitution of the United States, on the other hand, provides that:

"Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members . . . ."

■ Both federal and state courts have recognized that the foregoing provision gives final and exclusive jurisdiction to each House of Congress to determine election contests relating to its members. *Roudebush v. Hartke,* 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972); *Barry v. United States ex rel. Cunningham,* 279 U.S. 597, 49 S.Ct. 452, 73 L.Ed. 867 (1929); *Manion v. Holzman,* 379 F.2d 843 (7th Cir. 1967); *Rogers v. Barnes,* 172 Colo. 550, 474 P.2d 610 (1970); *Burchell v. State Board of Election Commissioners,* 252 Ky. 823, 68 S.W.2d 427 (1934); *Belknap v. Board of Canvassers of Ionia County,* 94 Mich. 516, 54 N.W. 376 (1893); *McLeod v. Kelly,* 304 Mich. 120, 7 N.W.2d 240 (1942); *In re Williams' Contest,* 198 Minn. 516, 270 N.W. 586 (1936); *Odegard v. Olson,* 264 Minn. 439, 119 N.W.2d 717 (1963); *Laxalt v. Cannon,* 80 Nev. 588, 397 P.2d 466 (1964); *Smith v. Polk,* 135 Ohio St. 70, 19 N.E.2d 281 (1939).

---

1. All statutory references are to Vernon's Annotated Texas Election Code, unless otherwise noted.

In *Barry v. Cunningham, supra,* the Supreme Court of the United States referred to this power of each House of Congress as "sole authority under the Constitution to judge of the elections, returns and qualifications of its members . . .", 279 U.S. at 619, 49 S.Ct. at 457. In *Rogers v. Barnes, supra,* the Colorado Supreme Court, speaking of the jurisdiction of the House and Senate in such contests, stated:

"Such jurisdiction being exclusive, no other body, including this Court, has the jurisdiction to hear and determine an election contest arising out of a general election for those two national offices." 474 P.2d at 612.

In *Odegard v. Olson,* 264 Minn. 439, 119 N.W.2d 717 (1963), the contestant in an election for the United States House of Representatives sought to enjoin the Secretary of State of the State of Minnesota from issuing a certificate of election to the contestee. The court denied such petition, stating:

"While the state legislature may regulate the conduct of elections subject to the limitations expressed in the U.S. Const., art. I, § 4, it should be conceded that under the provisions of art. I, § 5, each house of Congress is the sole judge of the election returns and qualifications of its members, exclusive of every other tribunal, including the courts." 119 N.W.2d at 719.

■ Article 9.01 of the Texas Election Code, as interpreted by Respondent Paul, is in diametrical conflict with and contrary to Article I, § 5, of the United States Constitution. Because of this clear and obvious conflict, it is reasonable to believe that the Legislature did not intend for the term "federal offices" to apply to members of Congress. Predecessor election contest statutes did not include federal offices.[2] The term was first used in the election

contest statute enacted in 1951 as part of a 95 page revision of the entire election code.[3] The revised election code was drafted by a commission of nine persons appointed under authority of the Fifty-first Legislature in 1950, with Judge Abner McCall as chairman and Dr. A. P. Cagle as counsel.[4] It was introduced as House Bill 6 of the Fifty-second Legislature in 1951. However, the inclusion of "federal offices" in Section 129 (now Art. 9.01) was not a recommendation of the revision commission and neither was the term included in House Bill 6 as introduced. The term "federal offices" was inserted in Sec. 129 of the committee substitute for H.B. 6 when the substitute was adopted by the House Committee on Privileges, Suffrage, and Elections. The committee substitute was enacted in both Houses without a separate vote of any nature relating to the term "federal offices." None of this legislative history is helpful in determining the meaning and intent of the term, but it does reveal that its inclusion was not a studied recommendation of the revision commission and that it was not one of the major items of consideration by the Legislature in adopting the revised election code.

In any event, as to members of Congress, Article 9.01 is unconstitutional and inapplicable. In this connection, it is significant that since 1951 there is no other reported case in which a party sought to contest a general or special election for the House or Senate of the United States under the terms of this statute.

■ Respondent Paul argues that the Supreme Court's decision in *Roudebush v. Hartke, supra,* sanctions this type of election contest in a State court so long as it does not interfere in any manner with a final determination of the contest by the United States House of Representatives. There are many differences between this

---

2. See Acts 1895, p. 58; R.S.1911, Art. 3046; R.S.1925, Art. 3041.

3. Acts 1951, 52nd Leg., ch. 492, pp. 1097–1194. Article 9.01 was enacted as Section 129 of the Act.

4. See McCall, "History of Texas Election Laws," 9 Vernon's Annotated Texas Election Code (1952), XVII, XXVIII–XXXVI, for an explanation of the background of the commission's appointment, its activities, and major changes recommended and enacted.

case and the *Hartke* case. In the first place, Indiana's recount statute and procedure was all that was involved in *Hartke.* Indiana was not operating under a statute which attempted to vest in its courts "original and exclusive jurisdiction of all contests of elections" to the House and Senate of the United States Congress. Furthermore, Hartke had been conditionally seated by the Senate "without prejudice to the outcome of an appeal pending in the Supreme Court of the United States, and without prejudice to the outcome of any recount that the Supreme Court might order. . . ." Gammage had already been through a somewhat similar recount in accordance with Texas law before he was certified as the duly elected Congressman, and he was seated by the House unconditionally.

A portion of the Indiana election process (the statutory recount) was not finished when Hartke was conditionally seated in the Senate, while the election process, including the recount, had been completed in Texas before Gammage was unconditionally seated in the House. This is important because the Constitution of the United States leaves the manner of holding elections for United States Senators and Representatives up to the States, subject to change by Congress.[5] The Supreme Court made it quite clear that the question in *Hartke* was not to which of the candidates the office belonged.[6] The Court said:

"  .  .  . Which candidate is entitled to be seated in the Senate is, to be sure, a nonjusticiable political question—a question that would not have been the business of this Court even before the Senate acted. The actual question before us, however, is a different one. It is whether an Indiana recount of the votes in the 1970 election is a valid exercise of the State's power, under Art. I, § 4, to pre-

scribe the times, places, and manner of holding elections, or is a forbidden infringement upon the Senate's power under Art. I, § 5." 405 U.S. at 19, 92 S.Ct. at 808.

The Court then held that "a recount is an integral part of the Indiana electoral process and is within the ambit of the broad powers delegated to the States by Art. I, § 4," but it hastened to recognize the Senate's power to make a final decision by adding: A recount does not prevent the Senate from independently evaluating the election any more than the initial count does. The Senate is free to accept or reject the apparent winner in either count, and, if it chooses, to conduct its own recount." 405 U.S. at 25–26, 92 S.Ct. at 810–811. The Court had previously said that the limited responsibilities involved in the recount did not constitute a "court proceeding" within the meaning of Title 28 U.S.C. § 2283, stating with reference to the Indiana procedure:

"When it grants a petition [for recount if correct in form], the court is required to appoint three commissioners to carry out the recount. Once these appointments are made, the Indiana Court has no other responsibilities or powers." 405 U.S. at 21, 92 S.Ct. at 808.

Thus the *Hartke* case lends no support to the validity of Article 9.01 or to the all-out election contest which Respondent Paul seeks to wage thereunder for a determination of "to whom the office belongs." This does not mean that Paul is without an adequate and constitutional remedy to press his contest. Congress has enacted a comprehensive procedure in 2 U.S.C.A. § 381 et seq., by which he can obtain evidence, depose witnesses, and have every allegation heard by the House of Representatives. Al-

---

**5.** U.S. Const., Art. I, § 4, provides in pertinent part:

"The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

**6.** In the present case Respondent Paul seeks such an election contest decision under Article 9.01 et seq. after the election process was over. Art. 9.14, for instance, directs the trial judge, after hearing the contest, to "decide to which of the contesting parties the office belongs."

though termed the "federal Contested Elections Act," the procedures apply only to contests of elections to the House of Representatives. Respondent Paul has filed his contest under this Act and it is now pending in a House Committee. He concedes that the House will make the final decision of the contest even if the State court had jurisdiction to try the contest.

We hold that Article 9.01 of the Texas Election Code is inapplicable to contests of elections of members of Congress, and any attempt to apply it to congressional elections would be in violation of Article I § 5 of the Constitution of the United States.

Accordingly, it is the judgment of this Court that the Judge of the 151st District Court of Harris County should dismiss the election contest pending in Cause No. 1,103,064 between Ron Paul and Robert Alton Gammage, and the Respondent, Ron Paul, should be prohibited from pursuing this election contest in the courts of this State under Article 9.01 et seq. of the Texas Election Code. The clerk of this Court will issue a writ of mandamus to the Honorable John L. Compton and a writ of prohibition to Ron Paul, if, and only if, either should be necessary to enforce the judgment of this Court. Because of the time element involved, no motion for rehearing will be entertained.

Dissenting opinion by REAVLEY, J., in which DENTON, J., joins.

Dissenting opinion by YARBROUGH, J., in which STEAKLEY, J., joins.

REAVLEY, Justice, dissenting.

I do not agree that Article 9.01 of the Texas Election Code is in conflict with and contrary to Article I, § 5, of the United States Constitution. There is no reason why the State of Texas may not protect and enforce its election procedures by permitting election contest actions in court— just so long as these actions do not impede an independent determination of the election result by the United States Congress. In the event Congress decides to make its own investigation and/or determination

apart from the judgment of the Texas courts according to Texas statutes, Congress may do so. That possibility and the final authority of Congress do not bar Texas entirely from a role in insuring the legal outcome of its elections. This is the construction which I understand the federal courts now give to this section of the United States Constitution. *Roudebush v. Hartke*, 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972); *Durkin v. Snow*, 403 F.Supp. 18 (D.N.H.1974).

DENTON, J., joins in this dissent.

YARBROUGH, Justice, dissenting.

I respectfully dissent.

This action for mandamus arises out of an election contest filed against Relator Gammage by Respondent Paul seeking to contest in state court the election of Robert Alton Gammage to the office of the United States House of Representatives for the 22nd Congressional District of Texas.

On November 2, 1976, Gammage defeated the incumbent Paul in the race for Representative for the 22nd Congressional District of Texas. Under the provisions of the Texas Election Code, article 7.15, § 23, a recount was conducted under the general observation of counsel from the Privileges and Elections Subcommittee of the United States House of Representatives Administration Committee. The recount showed Gammage the winner by 268 votes. He was thereafter certified as having won the election by the Secretary of the State of Texas.

Paul filed a notice of contest in state district court under the provisions of article 9.03 of the Texas Election Code. That cause, number 1,103,064, is now pending in the 151st District, Respondent the Honorable John L. Compton, presiding. Pursuant to 2 U.S.C. § 381 *et seq.* (1970), Paul also filed a notice to contest the election in the House of Representatives. The matter is pending before the United States House of Representatives Administration Committee.

On January 4, 1977, Gammage was sworn in as the Representative for the 22nd Congressional District of Texas. Immediately

afterward, Gammage filed a motion to dismiss the state court action for lack of jurisdiction over the contest. The motion was denied on January 12, 1977 and Paul proceeded with discovery in cause number 1,103,064.

At a hearing on February 7, 1977, Paul presented to the trial court his Motion to Compel the Oral Deposition of Gammage. The trial court granted the motion, but, at the instance of Gammage, scheduled the deposition for Saturday, February 12, 1977, and ordered that it be taken in Gammage's office in Washington, D.C.

On February 9, 1977, this Court granted Gammage leave to file his Petition for Writ of Mandamus, which sought to have the order compelling his oral deposition set aside and/or the action dismissed in the trial court. All proceedings in the trial court have been stayed. Paul has requested that this court immediately dissolve or modify its stay order so that he can prepare for and proceed to trial.

In argument before this Court, Paul claimed knowledge of at least 500 persons who illegally voted for Gammage in the November 2, 1976, election; of over 300 ballots that were miscounted for Relator from Fort Bend County alone; of at least 300 persons who supposedly voted but who cannot now be found, and of a number of voters who allegedly were either residents of other states or not physically present within the state on election day. Additionally, it is alleged that in 20 Harris County precincts originally carried for Gammage by very substantial margins, 149 more votes were counted than there were persons voting. Paul also complains of irregularity in the counting of absentee ballots, asserting that the election judge involved in the initial handling and counting of the absentee ballots was a paid employee of Gammage.

In his petition for writ of mandamus Gammage contends:

1. Article I, § 5, of the United States Constitution, places sole and exclusive jurisdiction in each House of Congress to determine the elections, returns, and qualifications of its own members, and therefore an election contest conducted in a state court infringes on the powers of Congress.

2. Because the House of Representatives will make the final decision of which candidate will be seated, any decision by a state court on this issue would be advisory only. Since the Texas Constitution prohibits "advisory opinions," the district court is without jurisdiction.

3. The Federal Contested Election Act, 2 U.S.C. § 381 et seq. (1970), preempts consideration by a state court of any contest of an election for the United States House of Representatives.

4. The state statutes relating to "election contests" fail to specify the relief to be granted by the district court upon the determination of the contest.

5. The Rules of Civil Procedure do not authorize the pretrial discovery deposition of Gammage in an election contest.

1

Article I, § 5 of the United States Constitution provides that each House shall be the judge of the elections, returns and qualifications of its own members. Article I, section 4 provides that "[t]he Times, Places and Manner of holding Elections for . . Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations . . . ."

In this controversy, we are called upon to determine whether the proceeding contemplated by Judge Compton, as presiding judge of the 151st Judicial District Court is a forbidden infringement on the power of the House of Representatives under article I, § 5, or the valid exercise of the state's power under article I, § 4, to describe the times, places and manner of holding elections.

To be sure, the power of the House of Representatives to seat a candidate is a non-justiciable political question—a question that would not have been the business of this or any other court. *See Roudebush v. Hartke*, 405 U.S. 15, 19, 92 S.Ct. 804, 807, 31 L.Ed.2d 1, 8 (1972).

As I understand it, however, the question of who is or who is not to be seated by the Congress of the United States is not before Judge Compton. Rather he is requested to decide those certain questions and issues which have come to typify and characterize an "election contest," namely: how many votes were lawfully cast in a state supervised and sanctioned election, and how many votes were illegally cast; how many votes were lawfully counted by and for whom, and similarly, how many votes were illegally counted, if any. Such an inquiry may ultimately address substantive questions and issues regarding the registration of those within the district who purported to vote, the integrity and accuracy of the vote inspectors and canvassers in the procedural discharge of their duties in both the counting and recounting of votes, and in the making and publication of a proper return. While the answers to these issues may be of interest to the Congress in its ultimate determination of who shall be seated, Congress is not bound by the answer to any of them. But these inquiries are clearly of direct concern and interest to the state in the administration and enforcement of the election laws pursuant to which the voters of District 22 were to select, in democratic fashion, their own congressional spokesman.

Chief Justice Hughes, writing in *Smiley v. Holm*, 285 U.S. 355, 366, 52 S.Ct. 397, 399, 76 L.Ed. 795, 800 (1932), both recognized and defined the breadth of the permissible state powers under article I, § 4:

It cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved.

This writing of Justice Hughes enumerates those functions which are the subject of the election contest proceeding now pending before Judge Compton.

Texas has found, along with many other states, that among the procedures necessary to guard against irregularity and error in the determination of election results is the availability of both a recount and, if necessary, an election contest. Despite the fact that a certification of election may be issued to the leading candidate within 17 days after the election, the results are not final if a candidate's option to initiate a contest is exercised.[1]

It is true that a state's verification of the accuracy of election results pursuant to its article I, § 4 powers is not totally severable from the power of the House of Representatives to judge elections and returns. But a recount or an election contest can be said to "usurp" the function of the House only if it frustrates the ability of the House to make an independent final judgment. An election contest does not prevent the House of Representatives from independently evaluating the election any more than does the initially announced election result. The

---

1. Tex. Election Code Ann. art. 8.38 (1967), requires the Secretary of State to open and count the returns of the election on the seventeenth day after the election, the day of election excluded, in the presence of the Governor and one other citizen.

Tex. Election Code Ann. art. 8.39 (1967), provides:

"When the returns have been counted, the governor shall immediately make out, sign and deliver a certificate of election, with the seal of the State thereto affixed, to the person or persons who shall have received the highest number of votes for each or any of said offices."

Tex. Election Code Ann. art. 9.03 (1967), provides:

"Any person intending to contest the election of any one holding a certificate of election for any office mentioned in this law, shall, within thirty (30) days after the return day of election, give him a notice thereof in writing and deliver to him, his agent or attorney, a written statement of the ground on which such contestant relies to sustain such contest. By the "return day" is meant the day on which the votes cast in said election are counted and the official result thereof declared."

House is free to accept or reject the apparent winner in either count, and if it chooses, to conduct its own inquiry into the substantive issues of the contest. Such were the principles announced by the Supreme Court of the United States in *Roudebush v. Hartke*, 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972), when that court considered the question of whether an Indiana recount of the votes in a 1970 senatorial election was a valid exercise of the state's power under article I, § 4, or an infringement upon the Senate's power under article I, § 5. That Court held that such recount was the province of the state pursuant to article I, § 4. I see little reason for distinguishing between an exhaustive election contest concerned with the substantive procedures of the election, and a mere cursory recount; their objectives are identical, i. e. to determine and designate the most popular candidate.

An election contest is an integral part of the Texas electoral process and is within the ambit of the broad powers delegated to the state by article I, § 4 of the United States Constitution.

2

Gammage also attacks article 9.01 of the Texas Election Code, categorizing that provision as an invalid attempt by the legislature to authorize an advisory opinion. The district court cannot finally determine who should represent the 22nd District because Congress has final authority to judge elections, qualifications, and returns of its members. Therefore, so the argument goes, any ruling by the district court in a Congressional contest would be an advisory opinion beyond the constitutional power of the court.

This argument misconstrues the nature and purpose of an election contest, the constitutional provision authorizing same, and the basis for the prior decisions of this Court invalidating advisory opinions.

At least in a democracy, an election is more than a periodic inconvenience to both the electorate and to those who would continue to hold political office. All recognize that it provides the mechanism for popular choice of both candidates and parties, but it also registers the philosophical viewpoint supported by a plurality of those who vote, as well as the degree of support enjoyed by minority interests. It provides a forum for public participation in politics, and thereby affords an educational opportunity for both those who become active partisans and those who are affected by such partisan activity. And it serves to peacefully resolve social conflicts: majority and minority groups alike are more willing to accept exercises of the state's coercive powers and to obey state laws when the state officials have been chosen by the People in a fair process. While the objective of an election may be to select the most popular candidate, its vital function is to legitimize governmental authority. An election is the means by which the rudder of the Ship of State is altered, if ever so slightly, and the philosophical course of our government is thereby determined. Without such legitimization, there is no duly constituted government, and the inherent right of the People to open revolution has historically been the inevitable alternative.

Those persons who participated in the election are entitled to an orderly declaration of the final results of that political event, without regard to the question of which candidate shall be seated by Congress.

Paul paid a filing fee, or otherwise qualified himself, in order to stand for election on the basis of philosophical and personal views in contrast to those of his opponent, Gammage. He did so with considerable support from a large contingent of the eligible voters of the 22nd Congressional District, who collectively appear to have exerted themselves, both physically and financially, all in confident reliance upon an implied assurance from the State of Texas that the election, to which they sought to dedicate themselves, would be conducted in an honest, fair and otherwise impartial manner, and in accordance with the law, as codified, in part, by the Texas Election Code. There is now a concomitant duty, on

the part of the State, to determine the integrity of that election process, and thereby reassure all citizens, including Respondent Paul and his supporters, that their confidence is well placed. And that duty is independent of anything that the Congress does, or does not do.

In this regard, an election contest is an end in-and-of itself, which is accomplished when the results of the election, and the right to the certificate of election, are declared by the district court. Congress cannot decide how this state declares an election or to whom the Texas certificate is to be delivered. These decisions are accomplished—not recommended or advised—by the Texas election contest proceeding.

The reasoning of the prior cases invalidating advisory opinions is clear and consistent: a court cannot give advice because the constitutional provisions granting its jurisdiction do not permit it. They are restricted to the exercise of "judicial power," which "is the power of a court to decide and pronounce a judgment and carry it into effect between persons and parties who bring a case before it for a decision." *Morrow v. Corbin*, 122 Tex. 553, 62 S.W.2d 641, 644 (1933). In every instance, however, the restriction of the courts to cases, controversies, parties, and judgments—to the judicial functions—results from the intention of the framers expressed in the provisions of the Texas Constitution.

I believe that the legislative history of both the constitutional and statutory provisions relating to election contests conclusively indicates that an election contest is an exception to the general rule that the district court is restricted to judicial functions, and to the necessity of parties, binding judgments, or controversies.

Originally, this Court held that the contest of an election is not within the judicial power granted to the courts of this state by the Texas Constitution. *Ex Parte Towles*, 48 Tex. 413 (1878); *Williamson v. Lane*, 52 Tex. 335 (1879); *Ex Parte Whitlow*, 59 Tex. 273 (1883). In *Williamson v. Lane, supra*, this Court construed the predecessor of the current election contest provisions of our election code. Tex.Laws 1873, ch. 50, at 67, 7 H. Gammel, Laws of Texas 519 (1871), *as amended*, Tex.Laws 1876, ch. 65, at 70, 8 H.Gammel, Laws of Texas 906 (1874). The statute there construed is remarkably similar to our current contest provisions.

Article 5, § 8 of the Constitution of 1876, which granted jurisdiction to the district court, was also much the same as the same numbered provision of the present Constitution. The 1876 Constitution contains the same general grant of the judicial power:

The District Court shall have original jurisdiction . . . of all suits, complaints or pleas whatever, without regard to any distinction between law and equity, when the matter in controversy shall be valued at or amount to five hundred dollars exclusive of interest; and the said courts and the judges thereof shall have power to issue writs of *habeas corpus* in felony cases, *mandamus,* injunction, *certiorari,* and all writs necessary to enforce their jurisdiction.

Tex.Const., art. 5, § 8 (1976) (emphasis in original).

This Court held in *Williamson v. Lane, supra*, that the general grant of judicial power as contained in the 1876 Constitution Proviso, did not confer jurisdiction over the "election contests" provided in the predecessor statute:

This leads us to the inquiry, whether the contest of an election authorized by the act of May 8, 1873, regulating contested elections, and the act to amend the same, approved July 20, 1876 (Gen.Laws, 13th Leg., p. 67; Gen.Laws, 15th Leg., p. 70) under and by virtue of which this proceeding was instituted and conducted, can be held to be either a suit, complaint, or plea in the sense in which these words are evidently used in the Constitution? These acts themselves, in my opinion, plainly answer this question in the negative.

That the right to an office may be, and has often been, the subject of a suit, cannot be questioned; but that the declared result of an election by the officer to whom this duty is intrusted, and the

resultant right to the certificate of election, may be contested otherwise than by an action, or suit, or proceeding before a judicial officer or tribunal, is certainly as equally well established.

The right to an elective office, as every one will admit, results from the legally-expressed choice of a majority of the electors; but how this choice is to be legally expressed and ascertained is a matter of legislative discretion and determination. If the Legislature should see fit to do so, unless restrained by some constitutional provision, it may make the declared result by the officer by whom the election is conducted final and conclusive upon all parties, or may authorize a review of the action of this officer by some other executive officer or commission, or intrust its determination to an existing judicial tribunal, if its constitutional jurisdiction will warrant its taking cognizance of it, and if not, it may, under our present Constitution, create one for this purpose. (Const., art. 5, sec. 1.)

In the case of *Rogers v. Johns*, 42 Tex. 339, the court again held that the determination of the result of an election is not a matter pertaining to the ordinary jurisdiction of the law in courts of justice. *It is in the nature of a political question, to be regulated, under the Constitution, by the political authority of the State.* (Emphasis added)

*Williamson v. Lane, supra*, 52 Tex. at 344–346 (emphasis added).

In *Ex Parte Whitlow*, 59 Tex. 273 (1883), this Court relied upon the *Williamson* case to hold invalid a provision for contesting an election for county seat.

When the Constitution was subsequently revised in 1891, however, the courts were given jurisdiction over contested elections regardless of their non-judicial nature:

The District Court shall have original jurisdiction . . . of all suits, complaints or pleas whatever, without regard to any distinction between law and equity, when the matter in controversy shall be valued at, or amount to five hundred dollars exclusive of interest; of *contested elections,* and said court and the judges thereof, shall have power to issue writs of habeas corpus, mandamus, injunction and certiorari, and all writs necessary to enforce their jurisdiction.

Tex.Const. art. 5, § 8 (emphasis added).

Pursuant to the above provision, the Texas Legislature has enacted and reenacted a comprehensive election code. Section 9.01 of this code grants the district court the power and entrusts it with the duty to hear election contests involving "federal offices," which term, by its plain and ordinary meaning, includes United States Congressional elections held within this state:

The district court shall have original and exclusive jurisdiction of *all contests* of elections, general or special, *for all* school, municipal, precinct, county, district, state offices, or *federal offices,* except elections for the offices of Governor, Lieutenant Governor, Comptroller of Public Accounts, Treasurer, Commissioner of the General Land Office, Attorney General, and Members of the Legislature. . .

Tex.Election Code Ann. art. 9.01 (1967) (emphasis added).

In light of the language of *Williamson, supra,* the subsequent amendment of article 5, § 8, to include election contests seems to have been clearly intended to grant a non-judicial, political, and declaratory power to the district court. This is further evidenced by the fact that the amendment does not refer to cases arising out of elections, or controversies involving them, but merely grants jurisdiction "of contested elections." We must presume that the amendment of section 8 in 1891 was made with knowledge of this Court's holding as to the nature, purpose, and effect of "contested elections" as expressed in *Williamson*. The district court was given power to determine election contests as defined by this Court at the time: as non-judicial, declaratory, and not necessarily creating any immediate right to office.

The jurisdiction of the district court is unaffected by whether or not the election contest proceeding will determine the right

to a congressional office. That is not the purpose of this proceeding. And if an act requires the district court to perform non-judicial *functions,* that act is clearly valid because the district court has also been entrusted with non-judicial *powers.*

### 3

Relator argues that Congress, by enacting the Federal Contested Elections Act, 2 U.S.C. § 381 *et seq.* (1970), has preempted contests of federal elections in state courts. If such preemption has occurred, the supremacy clause of the United States Constitution restrains any action by the courts of this state. *Hines v. Davidowitz,* 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941). In my opinion, however, the federal statute presents no impediment to an election contest in a state court.

In order for preemption to occur, either the federal statute must express a Congressional design to "occupy the field," or there must be an actual conflict between the federal and state statutory schemes such that both cannot stand in the same area. *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 141, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248, 256 (1963). The case before us is not one in which the federal statute by its terms expresses an intent to occupy exclusively an area. *See, e. g., Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). The question, then, is whether we should imply such an intent on the part of Congress.

The Federal Contested Elections Act revises the procedures followed by the parties to an election contest in the House of Representatives. The Act establishes a comprehensive framework patterned after the Federal Rules of Evidence with the intention of instituting "modern procedures which provide efficient, expeditious processing of the [contested] cases and a full opportunity for both parties to be heard." 1969 U.S.Code Cong. & Adm.News, pp. 1456, 1458–59. Section 382 provides for the filing of notice by the contestant with the clerk of the House. Section 383 sets out the requirements for the contestee's response.

Sections 386 to 390 make depositions available to both parties as a discovery tool, as well as establishing sanctions for failure to attend. The Act was not intended to make any changes in the substantive bases for election contests. 115 Cong.Rec. 30510 (1969).

I detect no support for the proposition that the Congress intended to preempt this area in either the language of the statute or its legislative history. The comprehensive nature of the House contest procedures is an insufficient basis for such an inference. Congress, being the final judge of the elections of its members, would have created a comprehensive procedure for handling election contests completely apart from any question of preemptive intent. Only in this way could the contest be streamlined, which would enable the House to resolve the matter and turn to legislative questions. Additionally, the federal statute had to be sufficiently comprehensive to provide discovery techniques. Otherwise, contesting parties from states that, unlike Texas, had no provision for election contest discovery would be unable to secure facts necessary to conduct the contest.

I would decline to adopt a stricter standard for ascertaining Congressional intent to preempt than that promulgated by the United States Supreme Court:

If Congress is authorized to act in a field, it should manifest its intention clearly. It will not be presumed that a federal statute was intended to supercede the exercise of the power of the state unless there is a clear manifestation of intention to do so. The exercise of federal supremacy is not lightly to be presumed.

*New York Department of Social Services v. Dublino,* 413 U.S. 405, 413, 93 S.Ct. 2507, 2513, 37 L.Ed.2d 688, 695 (1973), *quoting Schwartz v. Texas,* 344 U.S. 199, 202, 203, 73 S.Ct. 232, 235, 97 L.Ed. 231, 235 (1952). Placing the burden on Congress to express its intent to preempt is especially justified when the power of the state is derived from article I, § 4 of the United States Constitution. I would not impute to Congress the intent to exercise its power under the

second clause of article I, § 4 without more than is before us in this case.

The second basis for preemption lies in a conflict between federal and state legislation. The case before us does not involve a state standard of action that is more stringent than that of federal law. *See, e. g., Florida Lime and Avocado Growers, Inc. v. Paul, supra; Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960). Rather, our case involves parallel but separate proceedings: the state court will determine which party is entitled to receive the certificate, while the House of Representatives will decide who is to be seated. The problem arises because the prevailing party in one of these proceedings will not necessarily also succeed in the other. I do not believe that this is a conflict that stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Perez v. Campbell,* 402 U.S. 637, 649; 91 S.Ct. 1704, 1711, 29 L.Ed.2d 233, 242 (1971); *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581, 587 (1941). Conflicting state laws, absent repealing or exclusivity provisions in the federal statute, should be preempted only to the extent necessary to achieve the aims of the federal statute. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware,* 414 U.S. 117, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973).

The objectives of the Federal Contested Election Act are limited to providing an efficient procedure for contests in the House. The existence of an election contest suit in a state court will not hamper the House in applying these procedures to its

contest. Nor do articles 9.01–9.38a impinge on the ability of the House to conduct its own contest. The House, having the last word on its membership, will not be bound by any Texas court award of the certificate, although the adjudication made by a state court may actually aid the House in its inquiry. *See* 1969 U.S.Code Cong. & Adm. News, pp. 1456, 1457. In my opinion, both statutory schemes can stand in the same area.

4

Gammage argues that the state statutes relating to "election contests" as embodied within chapter 9 of the Texas Election Code, are deficient in that such statutes fail to specify the relief to be accorded by the district court upon the determination of the contest. Gammage contends that while the pertinent "contest statutes" may contemplate a final decision, there is no provision in the entirety of chapter 9 of the Texas Election Code suggesting (i. e. authorizing) that the court may determine or declare that the certificate of election issued by the Secretary of State should be withdrawn, or that the contestee had been wrongly certified.

It is apparent that the general statutory scheme of the Texas Election Code contemplates that when there is doubt about the results of a contested election, the final authority for declaring same rests with the district court, subject to appellate review.[2]

The district court may order the contestant to implead the Secretary of State, the chief elections officer of the state, as a party defendant in accordance with Rule 39,

---

**2.** Tex. Election Code Ann. art. 9.14 (1967), provides:

"If any vote or votes are found upon the trial of any contested election to be illegal or fraudulent, the trial court shall subtract such vote or votes from the poll of the candidate who received the same  . . . ."

Tex. Election Code Ann. art. 9.15 (1967), provides:

"If it appears on the trial of any contest [for any district office] that it is impossible to ascertain the true result of the election as to the office about which the contest is made, either from the returns of the election or

from any evidence within reach or from the returns considered in connection with other evidence, or should it appear from the evidence that such a number of legal voters were, by the officers or managers of the election, denied the privilege of voting as, had they been allowed to vote, would have materially changed the result, *the court shall adjudge such election void,* and direct the proper officers to order another election to fill said office; which election shall be ordered and held and returns thereof made in all respects as required by the general election laws of the State."

Texas Rules of Civil Procedure. Thereafter, the Secretary of State shall be subject to such orders as the court may enter in enforcing its jurisdiction and resolving the contest, including an order for the issuance of a valid certificate of election to the candidate determined by the court to have received the greatest number of legally cast votes.

5

Gammage contends that, even if the district court may entertain this action, the court has no authority to order a deposition to be taken because the discovery provisions of the Texas Rules of Civil Procedure are inapplicable to an "election contest." The basis for this contention is Rule 2, which provides in pertinent part:

> These rules shall govern the procedure in the justice, county, district, and appellate courts of the State of Texas in all actions of a civil nature, with such exceptions as may be hereinafter stated.

Gammage argues that "actions of a civil nature" do not include election contests.

It is undisputed that the legislature has the power to make the Rules of Civil Procedure apply to election contests. *See Odell v. Wharton,* 87 Tex. 173, 27 S.W. 123 (1894). I believe that they have done so. Both *Odell v. Wharton, supra,* and *DeShazo v. Webb,* 131 Tex. 108, 113 S.W.2d 519 (1938), which hold that an election contest is not governed by the procedures of a civil suit, were decided prior to the effective date of the Rules of Civil Procedure. Therefore neither case binds our interpretation of the applicability of the Rules. I do not equate the phrase "actions of a civil nature" with "civil suit." Although an election contest is not a civil suit, *Odel v. Wharton, supra,* such a contest is an action of a civil nature. I believe that the use of this phrase in Rule 2 was intended to draw a line between criminal proceedings, which would be governed by the Code of Criminal Procedure, and civil proceedings. *Gonzalez v. Rodriquez,* 250 S.W.2d 253 (Tex.Civ.App.—San Antonio 1952, no writ). Therefore, to the extent that specific procedural provisions are not established elsewhere in the Election Code, an election contest, although not a "civil suit," should be governed by discovery procedures in the Rules.

Accordingly, I would not grant the writ of mandamus or the writ of prohibition, and I would allow the deposition of Relator Gammage to proceed under the applicable Rules.

STEAKLEY, J., joins in this dissent.