Richard D. McINTYRE,
Petitioner-Appellant,

v.

Michael FALLAHAY and Frank McCloskey, Respondents-Appellees.

Frank McCLOSKEY,
Petitioner-Appellee,

v.

Richard D. McINTYRE,
Respondent-Appellant.

Nos. 85–1210, 85–1238.

United States Court of Appeals,
Seventh Circuit.

Argued June 7, 1985.

Decided July 2, 1985.

Swygert, Senior Circuit Judge, filed dissenting opinion.

Theodore Lockyear, Lockyear & Kornblum, Evansville, Ind., for petitioner-appellant.

Stanley C. Fickle, Barnes & Thornburg, Indianapolis, Ind., for respondents-appellees.

Before FLAUM and EASTERBROOK, Circuit Judges, and SWYGERT, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

The contest between Richard McIntyre and Frank McCloskey for the Eighth Congressional District in Indiana was the closest election in the history of the House of Representatives. On election night in November 1984, the count showed McCloskey the winner by 72 votes. After a correction of the returns from Gibson County, the count showed McIntyre ahead by 34 votes. The Secretary of State of Indiana gave McIntyre a certificate of election.

Both contestants sought recounts in particular counties. By the time the House of Representatives assembled, the recounts (and challenges to the recounts) had not been completed. The House seated neither contestant and directed the Committee on House Administration to investigate. H.Res. 1, 99th Cong., 1st Sess. (Jan. 3, 1985). The Committee decided to have its own recount. At the end of this recount, explicitly conducted under the Committee's rules rather than Indiana's for determining which ballots would count and which not, the Committee determined that McCloskey had won by four votes (116,645 to 116,641). H.R.Rep. 99–58, 99th Cong., 1st Sess. 2 (Apr. 29, 1985). On May 1, 1985, the House seated McCloskey.

The case before us arose out of the recount proceedings in Indiana. Under Indiana's procedures, a court appoints three commissioners who supervise the recount in a county. The commissioners report the new totals. Recounts were begun in fifteen counties, and the fifteen local courts gave the commissioners a variety of instructions (from elaborate rules to "count the ballots") on how to resolve disputes. After the commissioners had reported the results in two counties, McIntyre filed "Verified Objections to Report of the Recount Commission." These documents asked the local courts to give the commissioners new legal instructions about which ballots to count; the effect of the new instructions would have been to change the reported vote or to require still a third count of the ballots.

McCloskey removed the proceedings to federal court under 28 U.S.C. § 1441(a). He maintained that the "Verified Objections" raise issues of federal law because federal law has so occupied the field that only federal principles can be used to determine which ballots count in an election for a federal office. McIntyre moved to remand the cases under 28 U.S.C. § 1447(c), arguing that because the "Verified Objections" raised only issues of state law they were not within the original jurisdiction of the district court and hence not removable. The district court sided with McCloskey, holding that federal law occupies the field and that there is "no state law" applicable to the dispute. The district court then dismissed the proceedings because, in its view, the state courts lacked jurisdiction to determine the federal issues. Because the district court cannot have jurisdiction when the state court had none, the proceedings had to be terminated.

I

■ After the decision of the district court, the House recounted the votes and

seated McCloskey. The House acted under Art. I, sec. 5, cl. 1 of the Constitution, which provides that "Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members." The House is not only "Judge" but also final arbiter. Its decisions about which ballots count, and who won, are not reviewable in any court. *Roudebush v. Hartke,* 405 U.S. 15, 19, 92 S.Ct. 804, 807, 31 L.Ed.2d 1 (1972); *Barry v. United States ex rel. Cunningham,* 279 U.S. 597, 613, 49 S.Ct. 452, 455, 73 L.Ed. 867 (1929). As the Court said in *Barry,* the House has the authority "to determine the facts and apply the appropriate rules of law, and, finally, to render a judgment which is beyond the authority of any other tribunal to review." *Ibid.*

▮ Nothing we say or do, nothing the state court says or does, could affect the outcome of this election.[1] Because the dispute is not justiciable, it is inappropriate for a federal court even to intimate how Congress ought to have decided. The doctrine of justiciability is designed to prevent meddlesome advisory opinions fully as much as it is designed to prevent unwarranted interference with decisions properly made elsewhere. See *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962) (the political question doctrine is designed in part to prevent "the potentiality of embarrassment [that would result] from multifarious pronouncements by various departments on one question"); *Goldwater v. Carter,* 444 U.S. 996, 1005–06, 100 S.Ct. 533, 538–39, 62 L.Ed.2d 428 (1979) (Rehnquist, J., concurring in the judgment); cf. *Illinois ex rel. Barra v. Archer Daniels Midland Co.,* 704 F.2d 935, 941–42 (7th Cir.1983). When a court has no right to determine the outcome of a dispute, it also has a duty not to discuss the merits of that dispute.

Because a federal court may not award relief, the case no longer presents a "case or controversy" within the meaning of Article III. In *Roudebush* the Supreme Court held that a dispute about a recount of a contested election in Indiana was not moot because the Senate had seated the winner only conditionally, pending the outcome of the suit. The Court explained that once the "case is resolved and the Senate is assured that it has received the final Indiana tally, the Senate will be free to make an unconditional and final judgment under Art. I, § 5. Until that judgment is made, this controversy remains alive" (405 U.S. at 19, 92 S.Ct. at 808). The House has made its "unconditional and final judgment." It has counted the votes independently and is no longer interested in the final Indiana tally.

▮ The resolution of the dispute about who is entitled to the seat raises the question whether this court should dismiss the case rather than decide whether the case was properly removed. Ordinarily the appropriate disposition of a case that becomes moot while on appeal is an order vacating the judgment and directing dismissal. *Great Western Sugar Co. v. Nelson,* 442 U.S. 92, 99 S.Ct. 2149, 60 L.Ed.2d 735 (1979); *United States v. Munsingwear, Inc.,* 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950); *CFTC v. Board of Trade,* 701 F.2d 653 (7th Cir.1983). This terminates the litigation while preventing the underlying order from spawning adverse legal consequences. But state courts are free to hear disputes that are not "cases or controversies" within the jurisdiction of federal courts. When a case from a state court becomes moot while under review by the Supreme Court, that Court's practice therefore has been to dismiss the appeal or petition for certiorari, not to vacate the underlying judgment. E.g., *Board of Li-*

---

1. *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), holds that the refusal of the House to seat a person who was properly elected creates a justiciable controversy. The Constitution creates but a limited number of qualifications of office, and the Court reasoned that the House has final authority only with respect to the listed qualifications. The Court did not suggest that election contests present justiciable questions, see *id.* at 521 n. 42, 89 S.Ct. at 1963 n. 42, and the subsequent opinion in *Roudebush* shows that *Powell* is limited in the way its rationale suggests.

*cense Commissioners v. Pastore,* —— U.S. ——, 105 S.Ct. 685, 83 L.Ed.2d 618 (1985). To vacate the state court's judgment would be to prevent that court from adjudicating a dispute within its jurisdiction even though not within that of the federal courts.

Similar considerations require us to remand this dispute to the courts of Indiana, if removal was improper, rather than to dismiss the case. We have the power to do this; a federal court does not lack "jurisdiction" just because the controversy is not justiciable. See *Baker v. Carr, supra,* 369 U.S. at 198, 82 S.Ct. at 699. An order remanding the case is not the sort of interference with the decision of a coordinate branch of government that the political question doctrine forbids. It is a way to remove the case from the docket of the federal courts, as a dismissal for lack of justiciability also removes the case from the docket. Section 1447(c) itself calls for a district court to remand (rather than dismiss) cases in which it is without jurisdiction, which states a choice between ways to dispose of cases no longer within judicial power under Article III. Although we have not found any case that became nonjusticiable following removal, the same disposition is appropriate. If the case did not belong in federal court at all, it should be remanded rather than dismissed.

The remand of an improvidently removed case allows the state court to decide for itself whether to proceed. Considerations of federalism, in addition to strictly technical issues under § 1447(c), require that district courts not preclude state courts from hearing disputes that states may deem sufficiently "live" for their own purposes. A removal, no less than an injunction, bars the state courts from completing litigation begun there. The Supreme Court has held repeatedly that federal courts may not bar ongoing proceedings in state courts or agencies that involve exercises of state governmental power unless the proceedings were brought in bad faith or there are other extraordinary circumstances. *Younger v. Harris,* 401 U.S. 37, 91 S.Ct.

746, 27 L.Ed.2d 669 (1971); *Middlesex County Ethics Committee v. Garden State Bar Ass'n,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982). The Court therefore has construed removal statutes narrowly in order to protect state interests. E.g., *Johnson v. Mississippi,* 421 U.S. 213, 95 S.Ct. 1591, 44 L.Ed.2d 121 (1975). This should teach us to remand, rather than dismiss, whenever that is within our power.

A case securely dead for state as well as federal purposes doubtless should be dismissed outright. If the parties settle a case that was improvidently removed, the district court should simply dismiss the proceedings. A federal court need not extend litigation that has reached its conclusion. This case, however, has not reached an amicable end. The parties vigorously disagree about how state officials should have recounted the ballots. Although the House took charge of this election, it is not bound to take charge of future elections. In almost every case, the House and Senate accept the certificates of election that come from state counts and recounts. McIntyre and McCloskey may contest an election again, and if they do the procedures Indiana uses to count the ballots may be dispositive.

There is a fine line between the nonjusticiable issue of relief in federal court and any recurring issues of state law. Because McCloskey has been seated, it is not possible for a federal court to opine on the propriety of that decision or award relief; the federal issues therefore no longer present a case or controversy. But the dispute about which rules Indiana should use to resolve controversies about future elections survives. The same questions may arise in the future between the same litigants. The dispute about rules is a controversy "capable of repetition but evading review." See, e.g., *Moore v. Ogilvie,* 394 U.S. 814, 816, 89 S.Ct. 1493, 1494, 23 L.Ed.2d 1 (1969), applying this principle and adjudicating a question about election law even after the results of the election in question had become final. Indiana has a version of this doctrine, and its courts adju-

dicate recurring controversies of "great public interest." See *Indiana Education Employment Relations Board v. Mill Creek Classroom Teachers Ass'n*, 456 N.E.2d 709, 711 (Ind.1983); *Bartholomew County Hospital v. Ryan*, 440 N.E.2d 754 (Ind.App. 1st Dist.1982).

Indiana may desire to hear the arguments of McIntyre and McCloskey in order to establish legal rules for the next election. In federal cases under the Labor-Management Reporting and Disclosure Act, the Secretary of Labor often asks courts to determine the legality of rules that unions apply in their elections, and courts entertain such disputes even after the term of office at issue has expired, in order to establish the rules for future elections. E.g., *Steelworkers Local 3489 v. Usery*, 429 U.S. 305, 97 S.Ct. 611, 50 L.Ed.2d 502 (1977) (adjudicating in 1977 a challenge to an election held in 1970); *Wirtz v. Bottle Blowers*, 389 U.S. 463, 472–76, 88 S.Ct. 643, 648–51, 19 L.Ed.2d 705 (1968) (adjudicating a challenge even though another election had intervened); see also *NLRB v. Raytheon Co.*, 398 U.S. 25, 90 S.Ct. 1547, 26 L.Ed.2d 21 (1970). If the state courts do not wish to shape the rules for use in the future, they may think it appropriate to complete the recount to facilitate a comparison of the results under purely state rules with the results the House obtained by applying federal rules. This comparison would be of historical interest only; the House has decided this election once and for all. But such comparisons ultimately may lead to changes in the rules of either Indiana or the House.

The courts of Indiana are entitled to decide for themselves whether to conduct further proceedings with respect to this election—free, that is, if the cases were improvidently removed. That the case is defunct for purposes of relief in federal courts does not mean that we should *prohibit* Indiana from adjudicating any issues that remain live under state law—yet prohibition would be the outcome of dismissal rather than remand. No principle of federal law requires Indiana's courts to conduct further proceedings; we do not intimate that the state courts should do so; the state courts are free to decline to proceed; but if the cases were improvidently removed, no principle of federal law bars such proceedings, either. If the cases were properly removed, however, then the only appropriate disposition is dismissal. See *Cook v. Weber*, 698 F.2d 907 (7th Cir.1983).

II

■ The cases were removed under § 1441(a), which provides that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed." Whether the district courts have original jurisdiction of "Verified Objections" to recounts of elections depends on whether the recount proceedings are "in a State court" —that is, whether they are judicial proceedings—and whether the objections present questions of federal law. The only basis of original jurisdiction in district court would be federal question jurisdiction under 28 U.S.C. § 1331.

The parties do not agree about whether the "Verified Objections" were judicial proceedings. McIntyre says they were not (and hence were not removable), citing *Roudebush, supra*, in which the Supreme Court described the action of Indiana courts in appointing commissioners as not judicial in character. 405 U.S. at 21, 92 S.Ct. at 808. McCloskey says that "Verified Objections" are not part of the recount process but are new litigation challenging the outcome of the recount, which makes them judicial and so removable. Cf. *Miles v. Eltzroth*, 170 Ind.App. 37, 351 N.E.2d 77 (1976). McIntyre says that his complaint raises only issues of state law and so does not present a federal question; invoking the "well pleaded complaint" rule, he observes that his "Verified Objections" do not even mention federal law. See *Taylor v. Anderson*, 234 U.S. 74, 75–76, 34 S.Ct. 724, 725, 58 L.Ed. 1218 (1914). Under this rule a claim is within the original jurisdiction of a federal court only if a right or immunity is an essential element of the plaintiff's claim. *Gulley v. First National Bank in*

*Meridian,* 299 U.S. 109, 112, 57 S.Ct. 96, 97, 81 L.Ed. 70 (1936). McCloskey replies that federal law so occupies the field that any claim challenging the results of the recount necessarily arises under federal law. If it is impossible to frame a complaint under state law, the plaintiff's effort to do so does not prevent removal. Any adjudication "necessarily" calls for resolution of federal issues that are essential to the claim, could have been brought in the district court, and therefore is removable. *Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 13–27, 103 S.Ct. 2841, 2848–2856, 77 L.Ed.2d 420 (1983). McIntyre rejoins that not all cases of preemption permit removal, and that this one does not come within the scope of *Franchise Tax Board.*

■ We need not decide whether the Indiana proceeding was "judicial" or the extent to which federal preemption creates a right to remove. See *Oglesby v. RCA Corp.,* 752 F.2d 272 (7th Cir.1985). We conclude that federal law does not occupy the field. *Roudebush v. Hartke* shows that states may recount their elections even after one candidate has been conditionally seated. *Roudebush* does not control this case directly, because the Court did not consider in *Roudebush* whether state or federal rules determine which ballots should be counted. But *Roudebush* implies, and we hold, that states may use their own law. State and federal rules for counting ballots may coexist.

### III

Article I, sec. 4, cl. 1 provides that the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be as prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such regulations, except as to the Places of chusing Senators." This provision makes states responsible in the first instance for drawing district lines, designating the qualifications of voters, and counting the ballots. The rules affect state and local elections as well as those for federal offices.

State and federal elections often are held at the same time, and one ballot may apply to many different contests. The rules for counting ballots—such as whether a ballot must be initialled by an election judge—will affect both state and federal offices at once.

No one doubts that states have the power to draw the lines for congressional districts (subject to constitutional constraints), although these lines may have powerful influences on the outcome. No one doubts that states may select the qualifications of voters or control the methods of access to the ballot, yet again these have undeniable consequences. Cf. *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), one of many cases in which the Court assumes that state rules apply unless unconstitutional. Our history has seen many constitutional amendments altering the states' control of qualifications. The Fifteenth Amendment prohibits racial discrimination, the Nineteenth discrimination on account of sex; the Twenty-Fourth Amendment abolished poll taxes in contests for federal office, and the Twenty-Sixth lowered the minimum age of eligibility to eighteen. All of these amendments start with the assumption that in the absence of an assertion of national authority, states have the power to make the fundamental choices about how elections shall be conducted and who shall vote in them.

The tradition of state control is so powerful that even national legislation may be ineffective if that legislation alters the way states run elections for state and local office concurrent with elections for federal office. See *Oregon v. Mitchell,* 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970). Congress may legislate with respect to elections; Art. I, sec. 4, cl. 1 grants this power, and legislation such as the Voting Rights Act also rests on the enforcement provision of the Fifteenth Amendment. *South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). But such laws are express exercises of power granted to Congress, and they do

not show that all elections for federal office always require resort to federal rules.

There is no principled ground on which a court could say that although rules for establishing districts and determining the eligibility of voters rest on state law, rules for counting ballots rest on federal law. All of these issues are covered by Art. I, sec. 4, cl. 1. Establishing districts for the House affects only federal elections; if this is permissible, then establishing counting rules that affect local and federal elections at the same time must be permissible. A state with the power to hold elections must have rules for counting the ballots. These rules apply to the count on election day, when they govern local, state, and federal offices. They apply to the recount. *Roudebush v. Hartke, supra*, 405 U.S. at 25, 92 S.Ct. at 811, held that a "recount is an integral part of the Indiana electoral process and is within the ambit of the broad powers delegated to the States by Art. I, § 4." If the states may apply their domestic law to a recount, as the Court assumed in *Roudebush*, then they must be able to apply domestic law to a re-recount of the sort McIntyre sought by filing his "Verified Objections." The "Verified Objections" asked the state courts to declare what Indiana's rules are and to apply those rules uniformly. It cannot be the law—although it would be the result of McCloskey's position—that states may apply their own rules so long as the rules are unarticulated or haphazard, but must use federal rules whenever they announce them in public.[2]

Although the rules for counting and not counting ballots therefore are presumptively rules of state law under Art. I, sec. 4, cl. 1, Congress may override these rules under its own power. Cf. *Burroughs v. United States*, 290 U.S. 534, 54 S.Ct. 287, 78 L.Ed. 484 (1934). McCloskey maintains that it has done so in three ways: first, by enacting the Federal Contested Elections Act, 2 U.S.C. §§ 381–396; second, by establishing

a set of precedents that embody distinctively national rules for counting ballots; third, by taking jurisdiction of this election and deciding the outcome itself. None of these, however, so pervades the field that all competing principles of state law must yield.

The Contested Elections Act does not purport to lay down rules for counting ballots. It provides no more than that candidates seeking to contest elections may obtain the assistance of the courts to take discovery, which may be presented to Congress. The Act is not exclusive; indeed it was not invoked by either McCloskey or McIntyre, yet the House determined the result. A federal law preempts state law only when the two inevitably conflict or the law contains an explicit preemption clause. E.g., *Metropolitan Life Ins. Co. v. Massachusetts*, — U.S. —, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985); *Jones v. Rath Packing Co.*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). The Contested Elections Act neither conflicts with nor expressly preempts state rules. *Roudebush* was decided after the enactment of the Act, but the Court nonetheless allowed Indiana to recount the votes in what was surely a "contested" election.

The House's elaborate set of precedents that grew out of its adjudications of other contested elections comes closer to the mark. These precedents are rules for counting ballots. Under them the House counts all ballots from which the intent of the voter may be discerned, and it disregards "technical" requirements such as the initialling of ballots by election judges. See H.R.Rep. 99–58, *supra*, at 22–32 (marshalling older cases and establishing rules). But the observation that the House has a set of distinctive federal rules does not automatically lead to the conclusion that no state may have any other set of rules. From the foundation of the Republic, the House and Senate have accepted certificates of election arising out of elections

---

**2.** McCloskey's position is at least internally consistent. When asked at oral argument if federal law would govern the content of any state regulations of general applicability prescribing rules

for the counting of ballots, McCloskey's counsel replied that it would, and that a challenge to such rules therefore could be removed to federal court.

conducted under state rules. As the Committee on House Administration explained, the House "has consistently extended considerable deference to state election procedures. The certified winner will, except in the most extraordinary of circumstances, be sworn in as a Member-elect." *Id.* at 3. The committee stated that a problem had arisen in the McIntyre-McCloskey race in part because of delays in the state recount, *id.* at 4, which implies that there may be state recounts. Then the Committee elaborated the principles of Indiana law as it perceived them and explained why it found them unsatisfactory, *id.* at 16–22. This implies that the House acknowledges the (proper) existence of distinctively state rules.

 The House has consistently applied its precedents as substitutes for the rules of state law. It is entitled to do this under Art. I, sec. 5, cl. 1. The exercise of the power to apply federal law does not lead to the conclusion that there must be nothing but federal law; quite the contrary, the House's tradition of deference to state procedures, and the practice of seating people elected under distinctively state procedures, indicates that Congress has not exercised any power it may possess to occupy the field. We therefore conclude that states ordinarily may count, recount, and re-recount the ballots under their own rules. There is no constitutional difference between a recount (as in *Roudebush* ) and a re-recount (as here).

 The last question is whether this particular election should be treated differently because the House decided to count the ballots itself. We think not. The decision of the House certainly meant that the state would not have the final say, but then the state *never* has the final say. Whether or not the House conducts its own count, the state's count and the certificate of election are just advice from the state to Congress. The final decision always is that of the House, no matter who counts the ballots and no matter how many times they are tallied.

The root questions, therefore, are whether the states in giving this advice must use the same rules the House would use, and whether the decision of the House to ignore a state's advice alters the answer to this question. We explained above why states may give advice in accordance with their own rules. The decision of the House to ignore that advice—the upshot of the decision to count the ballots itself—does not diminish the power of the states to use their own counting rules. Quite the contrary, once the House decides to apply its own rules and count the ballots itself, there is less reason then before to insist that the state use federal rules in any continuing recount. Once the House decides it no longer cares to have the state's advice, the state is less constrained than before.

This does not mean that the state may interfere with the House's recount. It may not. Because the House is the judge of its own elections, it must have preferential access to the ballots. In the event of any conflict about who is to count which ballots and when, the House prevails. If a continuing state recount should endanger the security of the ballots, the state must desist until the House is done. But there was no conflict over access here. The cases were removed before the House began its count, and if Indiana wants to continue its recount it may do so now without creating multifarious claims of access.

 The House's initiation of a separate count terminates the state's power to count the ballots only if a continuation of the state's count would usurp the power of the House to be the final judge of the election. But here, as in *Roudebush,* "a recount can be said to 'usurp' the [House's] function only if it frustrates the [House's] ability to make an independent final judgment. A recount does not prevent the [House] from independently evaluating the election any more than the initial count does. The [House] is free to accept or reject the apparent winner in either count" (405 U.S. at 25–26, 92 S.Ct. at 810–811 footnotes omitted). There was no independent count by Congress in *Roudebush,* but

the principles are identical. Nothing the state does can undercut the power of the House to have the final say. There was no interference in *Roudebush*, and there is therefore none here.

### IV

■ Because the House has settled the election contest, nothing this or any other court can do will affect who represents Indiana's Eighth Congressional District through the end of 1986. The dispute at this stage may have more to do with political advantage than with legal rules; both sides may be tempted to employ the courts more to obtain publicity than to achieve justice. There is something unsettling about the prospect of one person sitting in Congress while the other seeks an advisory declaration in state courts that he "really" won. The political question doctrine is designed in part to prevent such unseemly conflicts between federal courts and the political branches of the government. The political question doctrine may not bind the courts of Indiana, but these concerns may lead the state courts to dismiss this litigation nonetheless.

The politics of the dispute, and the seemliness of this litigation, are not our concern. We have decided a single question—whether federal law so occupies the field that any effort to establish legal rules for counting ballots in an election to the House necessarily "arises under" federal law, even if the complaint asks only for the adjudication of issues of state law. We have held that state and federal rules for counting ballots can coexist in the absence of federal legislation explicitly preempting state rules. So long as a state recount does not actually interfere with or usurp the power of the House to be the final judge, the state can use such procedures as it deems wise to render its advice to Congress. Because federal law does not suffuse the field, the cases were improvidently removed. With this conclusion our own power lapses.

The judgments of the district court are vacated. The cases are remanded with instructions to remand both cases to the state courts from which they were removed.

SWYGERT, Senior Circuit Judge, dissenting.

Having found that "[n]othing we say or do, nothing the state court says or does, could affect the outcome of this election," *ante* at 1081, the court concludes that it "has no right to determine the outcome of ... [the] dispute ... [and] also has a duty not to discuss the merits of that dispute," *ante* at 1081. Yet the court inconsistently proceeds to decide the merits of the removal of the two State election contests to the federal court and, after ordering a remand, to speculate what the State courts may or may not do, and to evaluate the pursuit of further proceedings in those forums.

I dissent from this. approach by the majority including the rendering of such an advisory opinion. In my view, this court is without jurisdiction to remand the cases to the State courts because, aside from the question of mootness, the underlying election controversy is now a nonjusticiable political question.[*] Once the House has asserted its exclusive jurisdiction under U.S. Const. art. I, § 5 to seat a particular candidate as a member of the House, no court in the land—State or federal—has jurisdiction to hear any dispute contesting the outcome of the election. The only course that ought be taken is to dismiss the appeals.

Although the majority agrees that the House's decision to seat McCloskey is a nonjusticiable political question, it defines the State's recount as an entirely separate issue that the State courts are free to consider even after the House has reached its final judgment. It is true the States may conduct recounts pursuant to their constitutional power to regulate the time, place, and manner of congressional elections. U.S. Const. art. I, § 4; *Roudebush v.*

---

[*] On the distinction between mootness and justiciability, *see* Kates & Barker, *Mootness in Judicial Proceedings: Toward a Coherent Theory,* 62 Calif.L.Rev. 1385, 1387 (1974).

*Hartke,* 405 U.S. 15, 24–25, 92 S.Ct. 804, 810–811, 31 L.Ed.2d 1 (1972). Where a house of Congress has expressly refused to seat a candidate pending a State recount and where the recount does not undermine the ability of that house to conduct its own investigation of the election, federal courts cannot enjoin the recount. *Roudebush,* 405 U.S. at 18, 25–26, 92 S.Ct. 804, 810–811, 31 L.Ed.2d 1.

Here, however, the circumstances are such that continued recount proceedings are inconsistent with the House's absolute, unicameral authority to "Judge ... the Elections, Returns, and Qualifications of its own Members." U.S. Const. art. I, § 5. Before the House determines with finality who won the election, a system of dual sovereignty over elections is permissible because the State's tally is an important factor in the House's consideration. *See* H.Rep. No. 58, 99th Cong., 1st sess. 3 (1985) ("The House has consistently extended considerable deference to state election procedures."). Once the House does decide to seat a particular candidate, the election is *functus officio.* It is no longer realistic or important to distinguish between the State's power to recount the votes and the House's final authority to judge the victor. Continued State proceedings are an affront to the House's absolute authority because they can only serve as an official declaration by the State that the duly-seated representative of the people of Indiana is a pretender to the throne.

It can be argued that in a polity as open and pluralistic as ours, we should not be too disturbed by the prospect of a State, in effect, "dissenting" from a decision of the House. Yet, such an eventuality will be inconsistent with three fundamental tenets of constitutional law.

First, in our federal system of dual sovereignty, the national government is supreme. U.S. Const. art. VI, cl. 2. The notion that the States could nullify or challenge federal authority was put to rest by events culminating in the Civil War.

Second, the principle of separation of powers requires the various branches of government to respect power that is unambiguously committed by the constitutional text to a coordinate branch of government. *See Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). The State courts have no more authority than the federal courts to render their own independent pronouncements on an issue unambiguously committed to the House by U.S. Const. art. I, § 5.

Third, ours is a representative democracy. The people of Indiana's Eighth Congressional District cannot be properly represented unless the legitimacy and authority of one congressman to represent them are finally determined. Accordingly, once the House makes a final decision to seat a particular candidate, the entire election controversy becomes a political question for two of the reasons noted in *Baker,* 369 U.S. at 217, 82 S.Ct. at 710: there is "an unusual need for unquestioning adherence to a political decision already made" and there is "the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

McIntyre's remedy is to assert his first amendment rights, as a private citizen, to attack the choice of McCloskey. But he cannot, through the use of State proceedings, enlist the State as an ally in this regard, for such State action contravenes the principles of federal supremacy and separation of powers, as well as inhibits the right of the citizens in the district to be represented in Congress. I would therefore dismiss the consolidated appeals as involving a nonjusticiable political question.