**Stephen L. MORGAN, et al., Appellants,**

v.

**UNITED STATES of America, et al.**

No. 85–6053.

United States Court of Appeals, District of Columbia Circuit.

Sept. 9, 1986.

Stephen L. Morgan, pro se, was on the Response to Court's Order to Show Cause, for appellants.

Leonard Schaitman and William G. Cole, Attys., U.S. Dept. of Justice, Washington, D.C., were on the Reply to Appellants' Response to Court's Order to Show Cause, for appellees.

Before SCALIA and BUCKLEY, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

This case presents the question whether we have jurisdiction to review the substance or procedure of a determination by the House of Representatives that one of two contestants was lawfully elected to that body. Jurisdiction is contested on the basis of the Elections Clause of the Constitution, Article I, section 5, clause 1, which provides that "[e]ach House shall be the

Judge of the Elections, Returns and Qualifications of its own Members."

## I

This litigation grows out of one of the closest congressional elections in history. Initial returns in November 1984 showed that Democrat Frank McCloskey had won the House seat in the Eighth Congressional District of Indiana by 72 votes. After corrections to the returns, the count showed that his opponent, Republican Richard McIntyre, had won by 34 votes. On December 13, 1984 the Secretary of State of Indiana certified that McIntyre had won. A subsequent recount supervised by the state courts and completed January 22, 1985 showed that McIntyre had won by 418 votes. Before this recount could be completed, however, the House of Representatives assembled. On January 3, by a party-line vote, the House declined to seat McIntyre and appointed a Task Force of the House Administration Committee to investigate the election. The Task Force decided to conduct its own recount and to employ its own rules rather than those of Indiana state election law. Its report, issued April 29, concluded that McCloskey had won by four votes out of the more than 230,000 votes cast. H.R.REP. No. 58, 99th Cong., 1st Sess. 2 (1985). On May 1, again by a party-line vote, the House seated McCloskey.

In this suit, the latest of several based on aspects of the disputed election,[1] a group of registered Republicans residing in Indiana, Maryland, and Virginia named the United States, the House of Representatives, three Democratic House leaders, and three House employees as defendants. The plaintiffs, proceeding *pro se*, alleged that the refusal to seat McIntyre violated their rights of free speech and association, their first amendment right to petition the government for redress of grievances, their rights under the due process clause and the tenth amendment, along with several other constitutional provisions [2] and the Federal Contested Election Act, Pub.L. No. 91–138, 83 Stat. 284 (1969) (codified at 2 U.S.C. §§ 381–396 (1982)). They requested an injunction seating McIntyre with full seniority rights retroactive to January 3, 1985, a declaration that the House proceedings pursuant to the election investigation and the seating of McCloskey are void, and monetary damages.

The District Court dismissed the suit with prejudice as "the classic political question which is inappropriate for judicial review." Civil Action No. 85–1053, slip op. at 5 (D.D.C. Aug. 22, 1985) (Memorandum Order). On the subsequent appeal to this court, we denied the appellants' motions for summary reversal and expedition and directed the appellants to show cause why the decision of the District Court should not be summarily affirmed. The appellants have now responded to that order, and the appellees have submitted a reply.

## II

Summary affirmance is appropriate where the merits of an appeal "are so clear as to justify expedited action." *Walker v. Washington,* 627 F.2d 541, 545 (D.C.Cir.), *cert. denied,* 449 U.S. 994, 101 S.Ct. 532, 66 L.Ed.2d 292 (1980). Because the Constitution so unambiguously proscribes judicial review of the proceedings in the House of Representatives that led to the seating of McCloskey, we believe that further briefing and oral argument in this case would be pointless, and that the decision of the

---

1. *See Indiana v. United States,* —— U.S. ——, 105 S.Ct. 2652, 86 L.Ed.2d 270 (1985) (denying Indiana leave to file original complaint seeking order to require seating of McIntyre); *McIntyre v. Fallahay,* 766 F.2d 1078 (7th Cir.1985) (remanding state law claims surrounding state-conducted recount to state court); *McIntyre v. O'Neill,* 603 F.Supp. 1053 (D.D.C.1985), *vacated and remanded with instructions to dismiss as moot,* 766 F.2d 535 (D.C.Cir.1985) (denying request for injunction to seat McIntyre pending decision by House); *McCloskey v. Simcox,* No. EV 84–321–C (S.D.Ind.Dec. 7, 1984) (denying injunction to institute recount and to declare McCloskey the winner).

2. Art. I, § 1, cl. 1; Art. I, § 1, cl. 3; Art. I, § 4, cl. 1; Art. I, § 9, cl. 3; and Art. V.

District Court should be summarily affirmed.

█ It is difficult to imagine a clearer case of "textually demonstrable constitutional commitment" of an issue to another branch of government to the exclusion of the courts, *see Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), than the language of Article I, section 5, clause 1 that "[e]ach House shall be the Judge of the Elections, Returns and Qualifications of its own Members." The provision states not merely that each House "may judge" these matters, but that each House "shall be *the* Judge" (emphasis added). The exclusion of others—and in particular of others who are judges—could not be more evident. Hence, without need to rely upon the amorphous and partly prudential doctrine of "political questions," *see Vander Jagt v. O'Neill,* 699 F.2d 1166, 1173–74 (D.C.Cir.), *cert. denied,* 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983); Henkin, *Is There a "Political Question" Doctrine?,* 85 YALE L.J. 597 (1976); Wechsler, *Toward Neutral Principles of Constitutional Law,* 73 HARV.L.REV. 1, 9 (1959), we simply lack jurisdiction to proceed.

The history of the Elections Clause is entirely consistent with its plain exclusion of judicial jurisdiction. In the formative years of the American republic, it was "the uniform practice of England and America" for legislatures to be the final judges of the elections and qualifications of their members. I J. STORY, COMMENTARIES ON THE CONSTITUTION § 833, at 605 (5th ed. 1905) (hereinafter "J. STORY"). *See also* M. CLARKE, PARLIAMENTARY PRIVILEGE IN THE AMERICAN COLONIES 145 (Da Capo Press reprint ed. 1971); C. WARREN, THE MAKING OF THE CONSTITUTION 423–24 (2d ed. 1937). There was no opposition to the Elections Clause in the Federal Constitutional Convention, *see* I G. CURTIS, CONSTITUTIONAL HISTORY OF THE UNITED STATES 483 (Da Capo Press reprint ed. 1974); C. WARREN, *supra,* at 419, and the minor opposition in the ratification debates focused upon the clause's removal of final authority not from the *courts,* but from the state legislatures, where the Articles of Confederation had vested an analogous power. *See* Articles of Confederation, Article V, *reprinted in* DOCUMENTS ILLUSTRATIVE OF THE FORMATION OF THE UNION OF THE AMERICAN STATES, H. DOC. No. 398, 69th Cong., 1st Sess. 28–29 (1927). *See also* II M. JENSEN, DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 426–28 (Statement of Robert Whitehill in Pennsylvania Convention), 446 (Statement of William Findley in Pennsylvania Convention) (1976) (hereinafter "DOCUMENTARY HISTORY"). It is noteworthy that none of the responses to the opposition mentions the safeguard of judicial review. Such a safeguard was evidently unthinkable, since the determination of the legislative House was *itself* deemed to be a *judicial* one. As Chancellor Kent expressed it:

> [A]s each house acts in these cases [of judging the election return and qualification of its members] *in a judicial character,* its decisions, *like the decisions of any other court of justice,* ought to be regulated by known principles of law, and strictly adhered to, for the sake of uniformity and certainty.

I KENT'S COMMENTARIES 248 (8th ed. 1854) (1st ed. N.Y.1826) (emphasis added). As far as we are aware, in none of the discussions of the clause did there appear a trace of suggestion that the power it conferred was not exclusive and final. The fragments of recorded discussion imply that many took for granted the legislative "right of judging of the return of their members," II M. FARRAND, THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 241 (rev. ed. 1966) (Statement of Rufus King in Federal Convention), and viewed it as necessarily and naturally exclusive. *See* II DOCUMENTARY HISTORY 448 (Statement of William Findley in Pennsylvania Convention), 537 (Statement of Thomas McKean in Pennsylvania Convention), 565–66 (Statement of James Wilson in Pennsylvania Convention).

In almost two centuries of numerous election contests resolved by the House and Senate, beginning in the very first Con-

gress, *see* III L. DE PAUW, DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS 154–55, 179 (1977); I HINDS' PRECEDENTS OF THE HOUSE OF REPRESENTATIVES §§ 756–844 (1907) (hereinafter "HINDS' PRECEDENTS"); II *id.* at §§ 845–1135; VI CANNON'S PRECEDENTS OF THE HOUSE OF REPRESENTATIVES §§ 121–179 (1935); 2 DESCHLER'S PRECEDENTS OF THE HOUSE OF REPRESENTATIVES 459–638 (1977); SENATE ELECTION, EXPULSION AND CENSURE CASES FROM 1789 TO 1960, S. DOC. No. 71, 87th Cong., 2d Sess. 51, 61, 63, 64, 66, 67–68, 69–71, 85, 90, 100–03, 109, 112, 115, 116, 121–22, 128–32, 138, 139, 142, 145–47, 151–52 (1962), no court, as far as we are aware, has ever undertaken to review the legislative judgment or (until the present litigation) even been asked to do so. The Supreme Court case law therefore consists of nothing but dicta on the subject, which in their entirety support the plain interpretation we have applied. In 1928, in an opinion denying the authority of a Senate committee investigating an election to sue in court to compel production of election records (rather than following the theretofore customary course of relying on the Senate's own power to compel production of evidence), the Supreme Court said the following:

> [The Senate] is the judge of the elections, returns and qualifications of its members. Art. I, § 5. It is fully empowered, and may determine such matters without the aid of the House of Representatives or the Executive or Judicial Department.

*Reed v. County Commissioners,* 277 U.S. 376, 388, 48 S.Ct. 531, 532, 72 L.Ed. 924 (1928). In 1929, in upholding the authority of the Senate to have its Sergeant-at-Arms arrest a witness in order to bring him before it for testimony regarding an election contest, the Court said the following:

> Generally, the Senate is a legislative body, exercising in connection with the House only the power to make laws. But it has had conferred upon it by the Constitution certain powers which are not legislative but judicial in character. Among these is the power to judge of the elections, returns and qualifications of its own members. Art. I, § 5, cl. 1.... Ex-

ercise of the power necessarily involves the ascertainment of facts, the attendance of witnesses, the examination of such witnesses, with the power to compel them to answer pertinent questions, to determine the facts and apply the appropriate rules of law, and, finally, to render a judgment *which is beyond the authority of any other tribunal to review.*

*Barry v. United States ex rel. Cunningham,* 279 U.S. 597, 613, 49 S.Ct. 452, 455, 73 L.Ed. 867 (1929) (emphasis added). It must be acknowledged that the later case of *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), displays what might be termed a begrudging attitude towards Article I, section 5, stating that "[i]f examination of § 5 disclosed that the Constitution gives the House judicially unreviewable power to set qualifications for membership and to judge whether prospective members meet those qualifications, further review of the House determination *might well* be barred by the political question doctrine." *Id.* at 520, 89 S.Ct. at 1963 (emphasis added). (Unless the Constitution were unconstitutional, one would think that, on those hypotheses, further review *would certainly* be barred.) But the holding of the case was simply that Article I, section 5 had no application, since the House action in question did *not* consist of judging "qualifications" within the meaning of the provision. *Id.* at 549–50, 89 S.Ct. at 1978–79. (In the present case, there is no doubt that a judgment of "elections" is at issue.)

In any case, *Powell's* parsimony is more than overcome by the Supreme Court's most recent expression on the subject, which plainly endorses the interpretation we have set forth above. *Roudebush v. Hartke,* 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972), involved the claim by Senator Hartke, who had been certified winner by the Secretary of State of Indiana, that a state-conducted recount—prior to any action by the Senate to resolve the election dispute—was prohibited by Article I, section 5. A three-judge district court had upheld the claim and enjoined the recount.

While appeal to the Supreme Court was pending, the Senate had tentatively seated Hartke (without making its own election determination) " 'without prejudice to the outcome of any recount that the Supreme Court might order.' " *Id.* at 18, 92 S.Ct. at 807. Before the Supreme Court, Hartke made a mootness claim, which the Court described and discussed as follows:

This claim is based upon the proposition, as stated in appellee Hartke's brief, that the "basic issue" before the Court is "whether appellee Hartke or appellant Roudebush is entitled to the office of United States Senator from Indiana." Since the Senate has now seated Hartke, *and since this Court is without power to alter the Senate's judgment* [footnote citing and quoting *Reed v. County Commissioners*], it follows, the argument goes, that the cause is moot.

The difficulty with this argument is that it is based on an erroneous statement of the "basic issue." *Which candidate is entitled to be seated in the Senate is, to be sure, a nonjusticiable political question—a question that would not have been the business of this Court even before the Senate acted.* [Footnote citing *Powell v. McCormack.*] The actual question before us, however, is a different one. It is whether an Indiana recount of the votes in the 1970 election is a valid exercise of the State's power. . . .

*Id.* at 18–19, 92 S.Ct. at 807. (emphasis added).

We note that our holding is in accord with that of the Seventh Circuit, in a case arising out of the same election dispute at issue here. In *McIntyre v. Fallahay*, 766 F.2d 1078 (7th Cir.1985), the majority opinion by Judge Easterbrook remanded to state courts, for lack of a federal question, suits that had been removed to federal court alleging state election-law violations in the state recount. One of the possible bases for federal-question jurisdiction was rejected as follows:

Because McCloskey has been seated, it is not possible for a federal court to opine on the propriety of that decision or award relief; the federal issues therefore no longer present a case or controversy.

766 F.2d at 1082. Elsewhere, the opinion was even more explicit:

The House is not only "Judge" but also final arbiter. Its decision about which ballots count, and who won, are not reviewable in any court. . . .

Nothing we say or do, nothing the state court says or does, could affect the outcome of this election. Because the dispute is not justiciable, it is inappropriate for a federal court even to intimate how Congress ought to have decided.

766 F.2d at 1081 (footnote omitted). Judge Swygert, who dissented on the ground that the suit should have been dismissed rather than remanded to state court, was in full accord on this fundamental point:

In my view, this court is without jurisdiction to remand the cases to the State courts because, aside from the question of mootness, the underlying election controversy is now a nonjusticiable political question. Once the House has asserted its exclusive jurisdiction under U.S. Const. art. I, § 5 to seat a particular candidate as a member of the House, no court in the land—State or federal—has jurisdiction to hear any dispute contesting the outcome of the election.

766 F.2d at 1087 (footnote omitted) (Swygert, J., dissenting).

It is true, as the appellants point out, that this court has found no absolute prohibition of judicial review in the clause, adjacent to the Elections Clause, which states that "[e]ach House may determine the Rules of its Proceedings." Art. I, § 5, cl. 2. *See Vander Jagt v. O'Neill*, 699 F.2d 1166 (D.C.Cir.), *cert. denied*, 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983).[3] But

---

**3.** Although the panel majority in *Vander Jagt* did not find review explicitly prohibited by the Constitution, it nonetheless refrained from review. Judicial interference in such a case, it found, was "a 'startlingly unattractive' idea, given our respect for a coequal branch of government." 699 F.2d at 1176.

the language of that clause is not comparable. Authorization to determine rules of proceedings does not inevitably exclude review of the lawfulness of those rules; the command to "be the Judge of ... Elections" excludes other judges. The other constitutional text in which the appellants seek to find a helpful analogy, which provides that state legislatures may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," Art. I, § 4, cl. 1, is even less comparable. Moreover, even while undertaking judicial review of such state prescriptions, the Supreme Court held in no uncertain terms that the authority of the states must not preclude the exclusive authority of each House to decide whether to seat its members. *Roudebush v. Hartke,* 405 U.S. at 19, 92 S.Ct. 807.

While it is not our role to examine the wisdom of a disposition that appears so clearly in the text and history of the Constitution, we may observe that it makes eminent practical sense. The pressing legislative demands of contemporary government have if anything increased the need for quick, decisive resolution of election controversies. Adding a layer of judicial review, which would undoubtedly be resorted to on a regular basis, would frustrate this end. What is involved, it should be borne in mind, is not judicial resolution of a narrow issue of law, but review of an election recount, with all the fact-finding that that entails. If it be said that the relevant House is not the appropriate body to make the determination because of the possibility of improper political motivation, the response is that "[a]ll power may be abused if placed in unworthy hands. But it would be difficult ... to point out any other hands in which this power would be more safe, and at the same time equally effectual." *Luther v. Borden,* 48 U.S. (7 How.) 1, 44, 12 L.Ed. 581 (1849). As Justice Story observed:

> If [the power to judge elections is] lodged in any other than the legislative body itself, its independence, its purity, and even its existence and action may be destroyed or put into imminent danger.

No other body but itself can have the same motives to preserve and perpetuate these attributes; no other body can be so perpetually watchful to guard its own rights and privileges from infringement, to purify and vindicate its own character, and to preserve the rights and sustain the free choice of its constituents.

I J. STORY § 833, at 604–05. While the party-line votes in the present case (not at all unusual in such disputes) suggest that Justice Story's description of the purifying character of election-judging by the legislature may have been exaggerated, his basic point that institutional incentives make it safer to lodge the function there than anywhere else still stands. The major evil of interference by other branches of government is entirely avoided, while a substantial degree of responsibility is still provided by regular elections, the interim demands of public opinion, and the desire of each House to preserve its standing in relation to the other institutions of government.

■ Finally, we reject the appellants' contention that the Federal Contested Election Act authorizes the present suit. That legislation establishes certain procedures (notice of contest, response, service, depositions, subpoenas, and briefs) by which an election contest with respect to a seat in the House of Representatives shall be conducted; and failure to observe those procedures is among the allegations of the complaint. It is doubtful, to begin with, whether—in this matter which the Constitution commits exclusively to the House's judgment—the House's alleged failure to follow statutorily prescribed procedures can ever be the subject of judicial inquiry. *Cf. In re Voorhis,* 291 F. 673 (S.D.N.Y.1923) (L.Hand, J.) (denying judicial authority to determine compliance with subpoena issued by House under earlier statute establishing procedures for resolving election disputes). The House has on many occasions asserted authority to disregard the statutory rules for resolving disputed elections where it finds them inappropriate. *See, e.g.,* I HINDS' PRECEDENTS §§ 330, 449, 597, 600, 680, 713, 825, 833; II *id.* at § 1122. If

compliance with statutory procedures is reviewable, however, under the present statute it would appear to be so only at the instance of the contesting candidates who are parties to the quasi-judicial process that the statute establishes, *see, e.g.,* 2 U.S.C. §§ 383(b), 395—which includes none of the present plaintiffs. Finally, even if (as we doubt) compliance with the procedures is reviewable at the instance of these plaintiffs while the election contest is still alive (*e.g.,* by way of mandatory injunction to require certain procedures to be observed), once the outcome of the contest has been conclusively adjudged by the House there is no meaningful relief we can provide, and the dispute is therefore moot. *See McIntyre v. Fallahay,* 766 F.2d at 1082. Compelling compliance with the procedures post-judgment would be pointless and absurd; and damages cannot be awarded if failure to comply with the procedures caused no harm—which it did not if McCloskey was in fact entitled to be seated —which, in turn, is what the conclusive effect of the House's decision to seat McCloskey compels us to assume.

Our holding today does not, of course, preclude all judicial challenges bearing any relationship to legislative resolution of disputed elections. It is conceivable, for example, that in investigating such a dispute a House might go beyond its constitutional power to compel witnesses. In that event, "a clear showing of such arbitrary and improvident use of the power as will constitute a denial of due process of law" would justify limited "judicial interference." *Barry v. United States ex rel. Cunningham,* 279 U.S. at 620, 49 S.Ct. 457. Such a due process violation, however, must rest on violation of some individual interest beyond the failure to seat an individual or to recognize that person as the winner of an election. That substantive determination, which is the issue in the present case, resides entirely with the House.

On this court's own motion, the decision of the District Court is summarily affirmed.