**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ABDULLAH AL-KIDD,
                  *Plaintiff-Appellee,*

v.

JOHN ASHCROFT, Attorney General,
                  *Defendant-Appellant.*

No. 06-36059

D.C. No.
CV-05-00093-EJL
District of Idaho,
Boise

ORDER DENYING
PETITION FOR
REHEARING
EN BANC;
CONCURRENCE
IN THE ORDER;
DISSENTS TO
THE ORDER

Filed March 18, 2010

Before: David R. Thompson, Carlos T. Bea and
Milan D. Smith, Jr., Circuit Judges.

Order;
Concurrence by Judge Milan D. Smith, Jr.;
Dissent by Judge O'Scannlain;
Dissent by Judge Gould

---

# ORDER

Judge M. Smith voted to deny the petition for rehearing en banc, and Judge Thompson so recommended. Judge Bea voted to grant the petition for rehearing en banc.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc, and the matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35. Judge Bybee was recused in this matter.

The petition for rehearing en banc is DENIED.

---

M. SMITH, Circuit Judge, concurring in the denial of rehearing en banc:

I concur in the court's decision not to rehear this case en banc, and write to respond to the dissents from that decision.

In March 2005, al-Kidd brought suit in the District of Idaho against former United States Attorney General John Ashcroft, the United States, two FBI agents, and a number of other government agencies and officers in their official capacities. The suit sought damages under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for violations of al-Kidd's rights under the Fourth and Fifth Amendments to the Constitution, and for a direct violation of 18 U.S.C. § 3144. Each of the defendants moved to dismiss under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). The district court first denied the 12(b)(2) motion, holding that al-Kidd had properly alleged facts sufficient to establish personal jurisdiction over the parties in Idaho. Next, the district court denied the 12(b)(6) motion, rejecting the defendants' claims of absolute and qualified immunity. Only Ashcroft appealed the district court's rulings on the motions. In ruling on Ashcroft's interlocutory appeal of the district court's 12(b)(6) ruling, we are required to accept all allegations of material fact contained in al-Kidd's complaint as true and to construe those allegations in the light most favorable to al-Kidd. *See Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir.

2000). "Were this case before us on summary judgment, and were the facts pled in the complaint the only ones in the record, our decision might well be different. In the district court, moving forward, al-Kidd will bear a significant burden . . . ." *al-Kidd v. Ashcroft*, 580 F.3d 949, 977 (9th Cir. 2009).

All the parties to this action have approached it as a pure law enforcement matter. Ashcroft has not raised issues of national security or other exigencies at any point in this litigation. *Id.* at 973.

The facts alleged in al-Kidd's complaint are chilling, and serve as a cautionary tale to law-abiding citizens of the United States who fear the excesses of a powerful national government, as did many members of the Founding Generation. Al-Kidd, born Lavoni T. Kidd, is a United States citizen, born in Wichita, Kansas, and raised in Seattle, Washington. He graduated from the University of Idaho, where he was a highly regarded running back on the university's football team. He was married and had two young children.

While at the university, al-Kidd converted to Islam and changed his name to Abdullah al-Kidd. In the spring and summer of 2002, al-Kidd became a target of FBI surveillance conducted as part of a broad anti-terrorism investigation, aimed at Arab and Muslim men.[1] Al-Kidd cooperated with the FBI on several occasions when FBI agents asked to interview him.

Previous to this time, Ashcroft and others operating at his direction, or in concert with him, had decided to undertake a novel use of 18 U.S.C. § 3144, the material witness statute. Specifically,

1. At a press briefing, Ashcroft stated that the government was taking steps "to enhance [its] ability to protect the United States from the threat of terrorist aliens" and that

---

[1]Al-Kidd is Muslim, but is African-American and not of Arab descent.

"[a]ggressive *detention* of lawbreakers and *material witnesses* is vital to preventing, disrupting or delaying new attacks."

2. In DOJ memoranda, Ashcroft stressed the need "to use . . . aggressive arrest and detention tactics in the war on terror" and to use "every available law enforcement tool" to arrest persons who "participate in, or lend support to, terrorist activities."

3. A DOJ document entitled "Maintaining Custody of Terrorism *Suspects*" stated that "[i]f a person is legally present in this country, the person may be held only if federal or local law enforcement is pursuing criminal charges against him *or pursuant to a material witness warrant*."

4. Michael Chertoff, who was head of the DOJ's Criminal Division in the years immediately following the 9/11 attacks, stated of the material witness statute, "[i]t's an important investigative tool in the war on terrorism . . . . Bear in mind that you get not only testimony — you get fingerprints, you get hair samples — so there's all kinds of *evidence* you can get from a witness."

5. Then White House Counsel, Alberto Gonzales, stated that: "In any case where it appears that a U.S. citizen captured within the United States may be an al Qaeda operative and thus may qualify as an enemy combatant, information on the individual is developed and numerous options are considered by the various relative agencies (the Department of Defense, CIA and DOJ), including the potential for a criminal prosecution, detention as a *material witness*, and detention as an enemy combatant."

(emphasis added).

What apparently interested the FBI in al-Kidd was his friendship with one Sami Omar Al-Hussayen, a Saudi

national and a computer science student at the university, who was the webmaster of an Islamic proselyting website dedicated to, among other things, "[s]pread[ing] the correct knowledge of Islam; [and] [w]iden[ing] the horizons and understanding . . . among Muslims concerning different Islamic contemporary issues."

In the spring of 2003, al-Kidd planned to fly to Saudi Arabia to study Arabic and Islamic law on a scholarship at a Saudi university. Knowing of his travel plans from their interviews with al-Kidd, and apparently implementing Ashcroft's plan to aggressively use the material witness statute to detain "material witnesses," two FBI agents swore out an affidavit that contained multiple falsehoods to secure a material witness warrant against al-Kidd, allegedly so he would be available to testify against Al-Hussayen (who had been indicted one month previously for visa fraud and making false statements to U.S. officials).

On March 16, 2003, al-Kidd, bearing a round-trip ticket to Saudi Arabia, arrived at Dulles International Airport in Virginia. While al-Kidd was at the ticket counter, FBI agents handcuffed him, perp-walked him through the airport, and drove him to a police station, where he was placed in a holding cell. After being detained and questioned there for hours, al-Kidd was transferred to a detention center in Alexandria, Virginia.

For the next sixteen days, al-Kidd was detained in three different detention centers, one in Alexandria, one in Oklahoma, and one in Idaho. He was housed in high-security units within these facilities, which were the same units used to detain terrorists, and other persons charged with, or convicted of, other serious crimes. While at the Alexandria facility, al-Kidd was required to remain in a small cell where he ate his meals, except for one or two hours a day. He was strip-searched, denied visits by family, and denied requests to shower. Each time he was transferred to a new facility, he was shackled and

accompanied by other prisoners who had been charged with, or convicted of, serious crimes. After sixteen days, "al-Kidd was ordered released, on the conditions that he live with his wife at his in-laws' home in Nevada, limit his travel to Nevada and three other states, report regularly to a probation officer and consent to home visits throughout the period of supervision, and surrender his passport." *al-Kidd*, 580 F.3d at 953.

Not too long after al-Kidd's arrest and detention, in congressional testimony regarding the government's efforts to fight terrorism, FBI Director Robert Mueller boasted that the government had charged over 200 "suspected terrorists" with crimes. Mueller then offered the names of five individuals as examples of the government's recent successes. Four of those persons had been criminally charged with terrorism-related offenses; *the other was al-Kidd*.

"After almost a year under these conditions, the court permitted al-Kidd to secure his own residence in Las Vegas, as al-Kidd and his wife were separating. He lived under these conditions for three more months before being released at the end of Al-Hussayen's trial, *more than fifteen months after being arrested.*[2] In July 2004, al-Kidd was fired from his job. He alleges he was terminated when he was denied a security clearance because of his arrest. He is now separated from his wife, and has been unable to find steady employment. He was also deprived of his chance to study in Saudi Arabia on scholarship." *Id.* at 953-54 (emphasis added).

---

[2]"Al-Hussayen was not convicted of any of the charges brought against him. His trial ended in acquittal on the most serious charges, including conspiracy to provide material support to terrorists. After the jury failed to reach a verdict on the remaining lesser charges, the district court declared a mistrial. The government agreed not to retry Al-Hussayen and deported him to Saudi Arabia for visa violations." *Id.* at 953 n.4 (internal citation omitted).

*Al-Kidd was arrested more than a year before the Al-Hussayen trial began.* In their interviews with al-Kidd, the FBI never suggested, let alone demanded, that al-Kidd appear as a witness in the Al-Hussayen trial. *While in custody, al-Kidd was repeatedly questioned about matters unrelated to Al-Hussayen's alleged visa violations or false statements, but was never given a Miranda warning.* "Al-Kidd was *never called as a witness* in the Al-Hussayen trial or in any other criminal proceeding" despite his assurances that he would be willing to be a witness. *Id.* at 953-54, 963 (emphasis added). Importantly, *al-Kidd* was *never charged with the commission of any crime*, even though Mueller had boasted to Congress that the government had at that point in time charged over 200 "suspected terrorists" with crimes, and named al-Kidd individually, as well as four other persons who had been criminally charged with terrorism-related offenses, as evidence of the government's recent successes.

Accepting al-Kidd's factual allegations as true and drawing all inferences in his favor, we held that al-Kidd alleged sufficient facts in his complaint to state a claim against Ashcroft for creating, authorizing, implementing, and supervising a policy that violated al-Kidd's Fourth Amendment right against unreasonable searches and seizures. In doing so, we determined Ashcroft was not entitled to absolute or qualified immunity because he served an investigative function in connection with the challenged policy, which violated al-Kidd's clearly established constitutional rights. We also held that al-Kidd alleged sufficient facts in his complaint to state a claim that Ashcroft directly violated the material witness statute by his own personal conduct. Accordingly, we affirmed the district court's decision, allowing al-Kidd's case to proceed against Ashcroft beyond the pleading stage.

I

Contrary to what our dissenting colleague suggests, we did not "effectively declar[e] the material witness statute uncon-

stitutional." O'Scannlain Dissent at 4444. Judge O'Scannlain accuses the majority of holding that the Constitution "invalidates arrests *authorized by the statute*," and therefore, the statute is unconstitutional to the extent it authorizes arrests *such as the one in this case*. *Id.* at 4444 n.4 (emphasis added). The material witness statute, however, *does not authorize arrests like the one in this case*.

Here, the statute was not used to secure the testimony of a material witness, but rather to detain and interrogate a criminal suspect. Indeed, al-Kidd contends that the federal government enforced a policy sanctioning the use of the constitutionally-sound material witness statute for an end entirely outside the scope of the statute—criminal investigation. Therefore, we did not address the validity of the material witness statute, and we unequivocally stated that the decision "does nothing to curb the use of the material witness statute for *its stated purpose*." *al-Kidd*, 580 F.3d at 970 (emphasis added). We treated "only the misuse of the statute," and concluded that when the statute" is *not* being used for its stated purpose, but instead for the purpose of criminal investigation," the statute cannot be the basis for authorizing the government's conduct. *Id.*

## II

Judge O'Scannlain also accuses the majority of "distort[-ing] the bedrock Fourth Amendment principle that an official's subjective reasons for making an arrest are constitutionally irrelevant," in contravention of *Whren v. United States*, 517 U.S. 806 (1996). O'Scannlain Dissent at 4445. In *Whren*, the Supreme Court held that an individual officer's subjective intentions are irrelevant to the validity of a traffic stop under the Fourth Amendment. *Id.* at 810-13. But al-Kidd's case does not involve an ordinary traffic stop.

*Whren* stands for the proposition that " '[s]ubjective intentions play no role in *ordinary*, probable-cause Fourth Amend-

ment analysis.' " *Id.* at 813 (emphasis added). But outside that context, "programmatic purposes may be relevant to the validity of Fourth Amendment intrusions taken pursuant to a *general scheme* without individualized suspicion." *City of Indianapolis v. Edmond*, 531 U.S. 32, 45-46 (2000) (emphasis added).

Unlike the lawsuit in *Whren*, al-Kidd's suit does not involve a typical application of Fourth Amendment principles. *See Whren*, 517 U.S. at 819. Al-Kidd claims that Ashcroft implemented a *policy* or *program* sanctioning the arrest and detention of individuals suspected of terrorism under the guise of the material witness statute. Therefore, al-Kidd's claims against Ashcroft do not hinge on one officer's basis for probable cause that al-Kidd committed a crime, but rather on the government's "intrusions undertaken pursuant to a general scheme without individualized suspicion." *Edmond*, 531 U.S. at 45-46. For these reasons, *Whren* does not furnish the appropriate Fourth Amendment analytical framework for reviewing al-Kidd's claims, and as a result, we properly looked to *Edmond* and related cases that have employed a programmatic purpose test to gauge the constitutionality of a program or policy.

Our colleague contends that the programmatic purpose test is applicable only in cases involving warrantless searches. But here, accepting al-Kidd's allegations as true, this case *does* involve a warrantless search and seizure, as federal agents did not have a warrant to arrest al-Kidd for his commission of terrorism-related crimes.[3] Therefore, the programmatic pur-

---

[3]Judge O'Scannlain contends there was a warrant in this case, as federal agents possessed a warrant pursuant to the material witness statute. But a warrant is not a carte blanche for officers to do anything they desire under the auspices of the warrant. *See Malley v. Briggs*, 475 U.S. 335, 345-46 (1986) (holding that an officer's act of applying for a warrant *per se* does not entitle the officer to qualified immunity). A warrant cannot pass constitutional muster if the scope of the related search or seizure exceeds that

pose test was appropriate in light of the allegations in this particular case. Certainly, there are "challenges inherent in a purpose inquiry," but nonetheless, "courts routinely engage in this enterprise in many areas of constitutional jurisprudence as a means of sifting abusive government from that which is lawful." *Id.* at 46-47.

### III

Judge O'Scannlain also challenges the majority's holding that al-Kidd's Fourth Amendment right at issue in this case was clearly established in 2003. The doctrine of qualified immunity seeks to ensure that governmental officials have "fair notice" that their specific actions violate a constitutional right. *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002). "It is not necessary that the alleged acts have been previously held unconstitutional, as long as the unlawfulness [of the defendants' actions] was apparent in light of preexisting law." *Malik v. Brown*, 71 F.3d 724, 727 (9th Cir. 1995). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741. In fact, the absence of cases evaluating whether certain policies are constitutional "may be due more to the obviousness of the illegality than the novelty of the legal issue." *Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002). And where the courts do not have the benefit of factually analogous case law to assist with illuminating the parameters of the constitutional right, "general statements of the law" and "general constitutional rule[s] already identified in the decisional law" can adequately furnish the required fair warning to government

---

permitted by the terms of the validly issued warrant. *See Bivens,* 403 U.S. at 394-95 n.7. Here, al-Kidd's complaint alleged that the issued material witness warrant was executed to arrest al-Kidd for being a terrorist suspect, not as a material witness. Therefore, the warrant upon which Judge O'Scannlain bases his argument cannot reach the arrest of al-Kidd for criminal law violations.

officials about the constitutionality of their conduct. *United States v. Lanier*, 520 U.S. 259, 271 (1997).

Accepting the factual allegations in al-Kidd's complaint as true, and drawing all inferences in his favor, we determined that in light of the well-established Fourth Amendment principles in place at the time of al-Kidd's arrest, Ashcroft had a fair warning that the policy he authorized and encouraged was unconstitutional. Under *Beck v. Ohio*, Ashcroft knew that an arrest of a criminal suspect is constitutional only if at the time of the arrest, there is probable cause that the arrestee has committed or is committing the offense justifying the arrest. 379 U.S. 89, 91 (1964). Under *Edmond*, Ashcroft was on notice that "programmatic purposes may be relevant to the validity of Fourth Amendment intrusions undertaken pursuant to a general scheme without individualized suspicion," and that a program whose primary purpose is indistinguishable from "the general interest in crime control" violates the Fourth Amendment. 531 U.S. at 45-48. Because Ashcroft's alleged conduct was "so patently violative" of such well-established Fourth Amendment principles, "closely analogous pre-existing case law [was] not required to show that the law [was] clearly established." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (internal quotation marks omitted).

Only after we considered those well-established Fourth Amendment principles did we address a timely district court decision featuring a factual scenario closely analogous to that faced by al-Kidd. In *United States v. Awadallah*, Awadallah, like al-Kidd, was detained as a "material witness" for over two weeks in high-security prisons across the country, where he was kept in solitary confinement, shackled, strip-searched, and denied family contact. 202 F. Supp. 2d 55, 58 (S.D.N.Y. 2002). We recognized that the district court's statements in *Awadallah* were merely dicta, and that ultimately Awadallah was charged with criminal offenses. Nevertheless, the facts at issue in *Awadallah* were so closely analogous to those in *al-Kidd* that we deemed them relevant to the discussion, espe-

cially in light of our court's admonition to consider *all* relevant decisional law. *Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003) ("[I]n the absence of binding precedent, a court should look to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of . . . district courts." (internal quotation marks omitted)); *see also Sorrels*, 290 F.3d at 971 ("[U]npublished decisions of district courts may inform [a court's] qualified immunity analysis."). Further, if anyone in the United States is presumptively on notice of cases involving federal law enforcement officers and the DOJ, it is the nation's top law enforcement officer.

We did not stake the existence of the clearly established right in this case on the district court's statements in *Awadallah*. Rather, the district court's comments in *Awadallah* were unsurprising and entirely consistent with the long-established Fourth Amendment principles upon which we principally relied for our holding. Thus, we properly included a reference to *Awadallah* in considering whether al-Kidd had a clearly established right in March 2003.

IV

Lastly, Judge O'Scannlain misreads the majority's decision as holding that a cabinet-level official may be personally liable for actions taken by his subordinate alone. To the contrary, the holding fully complies with the Court's instruction in *Ashcroft v. Iqbal*, that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 129 S. Ct. 1937, 1948 (2009). Al-Kidd was not required to allege that Ashcroft actually authorized the specific warrant for al-Kidd, or any alleged misrepresentations or omissions contained therein. Under *Iqbal*, al-Kidd had to "plead sufficient factual matter to show that [Ashcroft] adopted and implemented the detention policies at issue" not for some neutral, lawful reason but for an unlawful purpose. *Id*. at 1948-49.

The complaint claims Ashcroft created, adopted and implemented a policy of using the material witness statute for an unlawful end. The complaint contains numerous factual allegations supporting that theory, specifically referring to Ashcroft's liability for his own personal involvement with creating, implementing, and enforcing the alleged policy at issue in this case. The complaint also contains statements made by Ashcroft himself in support of such a policy, including his statements that law enforcement was to use "every available law enforcement tool" to arrest persons "who participate in, or lend support to, terrorist activities," that it was the government's policy "to use . . . aggressive arrest and detention tactics in the war on terror," and that "[a]ggressive detention of lawbreakers and material witnesses [was] vital to preventing, disrupting or delaying new attacks." Thus, al-Kidd's § 3144 claim is not based upon allegations that Ashcroft simply knew or should have known that federal agents were actually violating or had the potential to violate the material witness statute in connection with the alleged policy; rather the complaint is based upon allegations of Ashcroft's *own* misconduct in sanctioning and promulgating a nationwide policy that systematically authorized the misuse of the material witness statute to arrest and detain suspected terrorists for whom the government had insufficient evidence of any wrongdoing.

Al-Kidd's case came before us in a Rule 12(b)(6) posture, and as such, we have an obligation to assume the allegations in al-Kidd's complaint are true, whether discovery would bear them out or not. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable[.]"). Accepting al-Kidd's factual allegations as true, we concluded that Ashcroft created, authorized, supervised, and enforced a policy that used the material witness statute in contravention of the Fourth Amendment, and that Ashcroft directly violated the material witness statute by his own personal involvement with the challenged policy.

However well-motivated Ashcroft's intentions may have been in creating, authorizing, supervising, and enforcing the misuse of the material witness statute in contravention of the Fourth Amendment, his motivation does not presumptively immunize the policy, or himself, the nation's chief law enforcement officer, and others implementing and executing it, from complying with the rule of law. "No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government from the highest to the lowest, are creatures of the law, and are bound to obey it." *United States v. Lee*, 106 U.S. 196, 220 (1882).

V

Finally, my dissenting colleagues express concerns that the court's decision in this case will dissuade qualified individuals from seeking the position of Attorney General and exercising the full range of their authority if chosen to fill that office. While I acknowledge their concerns, I note that cabinet officers are regularly sued in the courts of the United States, and that the government defends them both individually and in their official capacities, as necessary. I understand that 100% of Ashcroft's attorney fees incurred to date in this case have been paid by the United States. *See* 28 C.F.R. § 50.15(a), (b). Moreover, in the event Ashcroft is ultimately held personally liable in this lawsuit for his actions against al-Kidd, he will almost certainly be eligible to claim indemnification from the United States. *See* 28 C.F.R. § 50.15(c).

The truth is that there are legions of highly qualified attorneys who would gladly abandon almost any other position for the opportunity to serve as Attorney General of the United States. But it is critically important that whoever serves in that position be dedicated to the rule of law, and to upholding and defending the Constitution of the United States. Mindful that some in high office can be guilty of excessive zeal, former

Justice Brandeis, in his famous dissent in *Olmstead v. United States*, stated:

> Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding.

277 U.S. 438, 572-73 (1928 ) (Brandeis, J., dissenting).

The majority stands by its decision in this case, firm in the belief that it complies fully with controlling Supreme Court case law and the Constitution of the United States.

---

O'SCANNLAIN, Circuit Judge, joined by KOZINSKI, Chief Judge, and KLEINFELD, GOULD, TALLMAN, CALLAHAN, BEA and IKUTA, Circuit Judges, dissenting from the denial of rehearing en banc:

The majority holds that a former Attorney General of the United States may be *personally liable* for promulgating a policy under which his subordinates took actions expressly authorized by law. Judge Bea's dissent from the panel decision clearly and ably describes the several legal errors the panel makes in reaching this startling conclusion. *See al-Kidd v. Ashcroft*, 580 F.3d 949, 981-1000 (9th Cir. 2009) (Bea, J., dissenting). For my part, I write to express my concern at the scope of this decision. First, the majority holds that al-Kidd's detention under a *valid* material witness warrant violated his clearly established constitutional rights—a conclusion that effectively declares the material witness statute unconstitutional as applied to al-Kidd. Second, the majority holds that a cabinet-level official may be personally liable for actions

taken by his subordinates alone. Because of the gratuitous damage this decision inflicts upon orderly federal law enforcement, I must respectfully dissent from our refusal to rehear this case en banc.

I

On March 14, 2003, federal prosecutors sought a material witness warrant[1] to arrest Abdullah al-Kidd in connection with their prosecution of Sami Omar Al-Hussayen, whom a federal grand jury had indicted for visa fraud and making false statements to U.S. officials. According to a supporting affidavit submitted by prosecutors, al-Kidd had contacts with Al-Hussayen's suspected Jihadist organization, had received over $20,000 from Al-Hussayen, and, after returning from a trip to Yemen, had met with Al-Hussayen's associates. The affidavit also stated that al-Kidd had a plane ticket to fly to Saudi Arabia two days later, and that if he left the country, the government would "be unable to secure his presence at trial via subpoena." Based on this affidavit, a federal magistrate judge issued the warrant authorizing al-Kidd's arrest.

On March 16, federal agents arrested al-Kidd at the ticket counter at Dulles International Airport, outside Washington, D.C. After his arrest, the government detained al-Kidd for a

---

[1]The federal material witness statute, 18 U.S.C. § 3144, provides:

If it appears from an affidavit filed by a party that the testimony of a person is material in a criminal proceeding, and if it is shown that it may become impracticable to secure the presence of the person by subpoena, a judicial officer may order the arrest of the person and treat the person in accordance with the provisions of section 3142 of this title. No material witness may be detained because of inability to comply with any condition of release if the testimony of such witness can adequately be secured by deposition, and if further detention is not necessary to prevent a failure of justice. Release of a material witness may be delayed for a reasonable period of time until the deposition of the witness can be taken pursuant to the Federal Rules of Criminal Procedure.

total of sixteen days at several different federal facilities before releasing him on conditions that he surrender his passport, live with his wife at his in-laws' home in Nevada, limit his travel to Nevada and three other states, and regularly meet with a probation officer. The government did not ultimately call him to testify at Al-Hussayen's trial, and after the trial concluded, a judge granted al-Kidd's request that the restrictions on his travel be lifted.

Two years later, al-Kidd filed this lawsuit in the U.S. District Court for the District of Idaho. His first amended complaint alleges that Ashcroft violated the Fourth and Fifth Amendments and the federal material witness statute by promulgating a policy directing federal prosecutors to seek material witness warrants to detain individuals whom they believed, but could not prove, were involved in criminal activities. After the district court denied Ashcroft's motion to dismiss al-Kidd's complaint, Ashcroft appealed to this court.[2] The panel majority then affirmed the pertinent part of the district court's ruling in an extraordinarily broad and unprecedented decision.[3]

II

By permitting al-Kidd's suit to proceed, the majority commits two distinct but equally troubling legal errors, each of which will have far-reaching implications for how government officials perform their duties. First, the majority strips Ashcroft of his official immunity, holding that it was clearly established at the time of al-Kidd's arrest that prosecutors vio-

---

[2]Al-Kidd's complaint also names several other federal officers and agencies as defendants. None of the other defendants appealed the district court's decision denying qualified immunity, and therefore al-Kidd's claims against them were not before the panel.

[3]In a portion of its opinion in which Judge Bea concurred, the majority reversed the district court's determination that Ashcroft was not immune from al-Kidd's claim arising from the conditions of al-Kidd's confinement. *See al-Kidd*, 580 F.3d at 977-79.

late the Fourth Amendment when they obtain and execute a material witness warrant as a pretext for other law-enforcement objectives. Second, by holding that Ashcroft may be personally liable if his *subordinates* swore false affidavits to obtain the warrant authorizing al-Kidd's arrest, the majority stretches beyond recognition the rule that a government official is liable only when he personally violates the constitution. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

A

1

The majority begins by effectively declaring the material witness statute unconstitutional, at least as applied to al-Kidd. But al-Kidd does not appear to contest that he met the statutory requirements for arrest as a material witness. *See al-Kidd*, 580 F.3d at 957. Nor does he contend that the material witness statute is *facially* unconstitutional. *Id.* at 966. The majority nevertheless holds that because prosecutors used a material witness warrant to arrest al-Kidd as a *pretext* to a criminal investigation, his detention violated the Fourth Amendment. This conclusion—that the material witness statute authorized al-Kidd's arrest while the Fourth Amendment forbade it—can only mean that the material witness statute itself is unconstitutional in this circumstance.[4] With respect, such conclusion is preposterous.

---

[4]I acknowledge that the majority does not *say* that it is declaring the material witness statute unconstitutional. Nevertheless, that is what it *does*. The majority acknowledges that individuals arrested under the allegedly unconstitutional policy "met the facial statutory requirements of [the material witness statute]." *Al-Kidd*, 580 F.3d at 957. Despite this, in a section of its opinion entitled "*Al-Kidd's Fourth Amendment Rights Were Violated*," *id.* at 965, it concludes that al-Kidd's arrest was impermissible. By concluding that the Constitution invalidates arrests authorized by the statute, the majority must conclude that the statute is unconstitutional to the extent it authorizes arrests such as the one in this case—put another way, that the statute is unconstitutional as applied to al-Kidd.

The federal material witness statute has existed since 1789, *Bacon v. United States*, 449 F.2d 933, 938 (9th Cir. 1971), every state has adopted a version of the statute, *id.* at 939, and (at least until now), "[t]he constitutionality of th[e] statute apparently has never been doubted," *Barry v. United States ex rel Cunningham*, 279 U.S. 597, 617 (1929). The majority's decision to invalidate a statute passed by the First Congress and retained by every subsequent Congress should have *by itself* prompted us to rehear this case.

The majority does not stop at declaring a 200-year-old statute unconstitutional, however. It also distorts the bedrock Fourth Amendment principle that an official's subjective reasons for making an arrest are constitutionally irrelevant. The majority holds that if prosecutors used the material witness warrant as a *pretext* to arrest al-Kidd "with the *ulterior* and . . . unconstitutional *purpose* of investigating or preemptively detaining" him, they violated his Fourth Amendment rights. *Al-Kidd*, 580 F.3d at 957 (emphasis added). This holding is impossible to square with Supreme Court precedent, which has "flatly dismissed the idea that an *ulterior motive* might serve to strip the agents of their legal justification." *Whren v. United States*, 517 U.S. 806, 812 (1996) (emphasis added). Given that al-Kidd has conceded that he met the facial requirements for arrest under the material witness statute, the prosecutor's purpose for arresting him is immaterial to the Fourth Amendment analysis because "[s]ubjective intent alone . . . does not make otherwise lawful conduct illegal or unconstitutional." *Scott v. United States*, 436 U.S. 128, 136-37 (1978); *see also Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent [of the government official taking the action]." (internal quotation marks omitted)).

The majority, unfortunately, disagrees. Although it acknowledges that an officer's subjective intentions are irrele-

vant to "ordinary, probable-cause Fourth Amendment analysis," it holds that because al-Kidd's arrest was not supported by probable cause *that al-Kidd had committed a crime*, his detention was constitutionally infirm. *Al-Kidd*, 580 F.3d at 966. To reach this novel result, the majority relies on the Supreme Court's "programmatic purpose" test. *Id.* at 968-69. Contrary to the majority's analysis, that test is totally inapplicable here. The Supreme Court uses the programmatic purpose test to evaluate the constitutionality of *warrantless* searches. *See Indianapolis v. Edmond*, 531 U.S. 32 (2000). Because al-Kidd was arrested under a valid warrant, however, the programmatic purpose test, and its concern for the purpose of an arrest, is entirely inapplicable here. Thus, the majority concludes that the material witness warrant authorizing al-Kidd's arrest is unconstitutional only after examining the subjective reasons prosecutors sought the warrant, something the Supreme Court has repeatedly forbidden us to do. This error alone warranted en banc review.

2

The majority then compounds its error by holding that the right to be free from a detention under a pretextual material witness warrant was clearly established at the time of al-Kidd's arrest. The majority claims this result is compelled by three sources: the clearly established definition of probable cause, *al-Kidd*, 580 F.3d at 971, "the history and purposes of the Fourth Amendment," *id.*, and a footnote in a district court opinion, *id.* at 972 (quoting *United States v. Awadallah*, 202 F. Supp. 2d 55, 77 n.28 (S.D.N.Y. 2002), *rev'd on other grounds*, 349 F.3d 42 (2d Cir. 2003)).

The majority's reliance on the first two sources proves too much, of course. All government officials are presumed to be aware of the definition of probable cause and the history and purposes of the Fourth Amendment. If this is sufficient clearly to establish how the Fourth Amendment applies in a particular setting, then how can *any* Fourth Amendment rule ever *not* be

"clearly established"? *See Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987).

The majority's reliance on *Awadallah* is possibly even more troubling. The majority's assertion that three sentences of dicta in a footnote to a subsequently reversed district court opinion clearly establish a right that the majority expended nearly three-thousand words describing is truly astonishing.[5] Under the majority's reasoning, our government's officials may find themselves subject to suits for decisions that they did not—and, even if they spent their time doing nothing but reading reports of federal judicial decisions, could not—know contravened the Constitution. Indeed, the lack of support for the majority's conclusion is so glaring that even the editorial board of a distinguished newspaper remarked that "officials should not have to fear personal lawsuits for performing their duties in good faith and in violation of *no established legal* precedent." Editorial, *Suing Mr. Ashcroft: Why a Court's Decision to Allow a Personal Lawsuit Against the Former Attorney General Should Not Stand*, Wash. Post, Sept. 12, 2009, at A16 (emphasis added).

Thus, the majority has held that a former Attorney General might suffer personal liability solely for acting within the bounds of federal law. One shudders at the thought that this decision might deter the incumbent and future Attorneys General from exercising the full range of their lawful authority to protect the security of the United States.

B

The majority goes further still, however, by holding that Ashcroft may be held personally liable to al-Kidd if his *subordinates* provided false testimony in support of their applica-

---

[5]In addition, the Chief Judge of the Southern District of New York has expressly declined to follow Awadallah. *See In re Application of U.S. for a Material Witness Warrant*, 213 F. Supp. 2d 287, 288 (S.D.N.Y. 2002).

tion for a material witness warrant. *Al-Kidd*, 580 F.3d at 975-
76. It cannot be contested that al-Kidd has a clearly estab-
lished right to be free of an arrest based on fraudulent testi-
mony. *See Franks v. Delaware*, 438 U.S. 154, 164-65 (1978).
Al-Kidd does not allege that Ashcroft *personally* swore any
false testimony, however. Rather, it was Ashcroft's *subordi-
nates* who provided the testimony that al-Kidd alleges was
false. In light of *Iqbal*'s holding that "each Government offi-
cial, his or her title notwithstanding, is only liable for his or
her own misconduct," 129 S. Ct. at 1949, al-Kidd's complaint
fails to allege facts sufficient to establish a cause of action
against Ashcroft.

As Judge Bea explains in detail, al-Kidd does not allege
that Ashcroft encouraged federal prosecutors to lie in applica-
tions for material witness warrants. *Al-Kidd*, 580 F.3d at 992-
93 (Bea, J., dissenting). Al-Kidd does not claim that Ashcroft
even *knew* that his subordinates might be submitting false
affidavits. At most, al-Kidd claims that Ashcroft's policies
encouraged his subordinates to use material witness warrants
to detain individuals within the maximum extent authorized
by law. *Id.* at 993. By permitting al-Kidd's claim that Ash-
croft has violated *Franks* to proceed, the majority permits al-
Kidd to seek damages from Ashcroft for his subordinates'
alleged misconduct, a result indisputably at odds with *Iqbal*.
*See* 129 S. Ct. at 1949.

### III

After this decision, a prosecutor who executes a perfectly
valid material witness warrant must worry that he will find
himself sued and liable in damages for violating the Fourth
Amendment. Moreover, any cabinet-level official must worry
that he might be personally liable if his *subordinates* take an
action perfectly *consistent* with then-existing federal law.[6]

---

[6]The *possibility* the federal government might reimburse Ashcroft for
any judgment against him hardly removes the likelihood that this decision

Because these results are contrary to both logic and law, I respectfully dissent from our unfortunate rejection of the opportunity to correct these errors by rehearing this case en banc.

---

GOULD, Circuit Judge, with whom KOZINSKI, Chief Judge, and O'SCANNLAIN, KLEINFELD, CALLAHAN, BEA, and IKUTA, Circuit Judges, join, dissenting from the denial of rehearing en banc:

I agree with Judge Bea's persuasive dissent from the majority opinion and agree with Judge O'Scannlain's persuasive dissent from denial of rehearing en banc. I add this pragmatic concern: If an Attorney General of the United States can be held liable and subject to monetary damages primarily because of actions of law enforcement subordinates, who allegedly gained and executed a material witness warrant for contrived purposes, I fear that it will become more difficult to persuade a person of great talent and integrity to leave his or her current occupation in order to hold the nation's highest law office. The panel majority's decision in effect says "good bye" to many talented persons who would otherwise be willing to serve as Attorney General with great distinction and attendant benefit to our country.

---

might deter the current or future Attorneys General from carrying out their duties. *Anderson*, 483 U.S. at 641 n.3 (noting that 28 C.F.R. § 50.15(c) "*permit*[*s*] reimbursement of Department of Justice employees when the Attorney General finds reimbursement appropriate"). Claims for reimbursement have been denied on occasion. *See Falkowski v. EEOC*, 719 F.2d 470, 472-76 (D.C. Cir. 1983) (arising after the government declined to represent a former employee in a lawsuit related to her employment), *vacated sub nom. U.S. Dep't of Justice v. Falkowski*, 471 U.S. 1001 (1985); *Turner v. Schultz*, 187 F. Supp. 2d 1288, 1290 (D. Colo. 2002) (same). Moreover, the decision to provide or to deny such reimbursement is entirely within the discretion of the current Attorney General, and is not subject to judicial review. *Falkowski v. EEOC*, 764 F.2d 907, 911 (D.C. Cir. 1985).